141 P.3d 440

STATE of Hawai'i, Plaintiff–Appellee,

v.

Michael KAHAPEA, Defendant–Appellant,

**and**

Norman Tam, Russell Williams, also known as R.J. Williams and Russell Williams, doing business as R.J., Hauling, Claude Hebaru, also known as Claude Hebaru doing business as Titan Moving and Hauling, Donald Hall, Sr., also known as Donald Hall, Sr., doing business as A–1 Hawaii Trucking and Equipment, Donna Hashimoto–Abelaye, also known as Donna Abelaye, doing business as Specialty Pacific Builders, Inc., David Brian Kaahaaina, also known as David Brian Kaahaaina, doing business as American Hauling, and Stephen Swift, Defendants.

No. 27278.

Supreme Court of Hawai'i.

Aug. 9, 2006.

Richard Naiwieha Wurdeman, on the briefs, for defendant-appellant, Michael Kahapea.

Donn Fudo, deputy prosecuting attorney, on the briefs, for plaintiff-appellee, State of Hawai'i.

MOON, C.J., LEVINSON and NAKAYAMA, JJ.; and ACOBA, J., concurring separately, with whom DUFFY, J., joins.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Michael Kahapea appeals from the April 7, 2005 order of the circuit court of the first circuit, the Honorable Reynaldo D. Graulty presiding, denying Kahapea's February 7, 2005 motion pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 35, for correction and/or reduction of the sentence imposed by the circuit court's October 19, 2000 judgment.[1]

On appeal, Kahapea contends: (1) that the circuit court abused its discretion in sentencing him to five consecutive ten-year terms of imprisonment on October 19, 2000 and failing to correct or reduce that sentence in its April 7, 2005 order; (2) that the circuit court's imposition of five consecutive ten-year terms of imprisonment constituted "cruel and unusual punishment" contravening the eighth amendment to the United States Constitution and article I, section 12 of the Hawai'i Constitution; and (3) that the circuit court, by ordering his sentences to run consecutively, deprived him of his right to a trial by jury as interpreted by the United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

For the reasons discussed *infra* in part III, this court affirms the circuit court's April 7, 2005 order.

## I. BACKGROUND

### A. Factual Background

The Ewa Villages Revitalization Project evolved from the vision of the City and County of Honolulu (hereinafter, "the City") to revitalize the 'Ewa area and "provide home ownership opportunities for the people that lived in ... Ewa Villages." To implement this vision, extensive relocation of residential and commercial tenants on a temporary or permanent basis was necessary, and the City earmarked six million dollars for that purpose.

The City's Department of Housing and Community Development (DHCD), Housing Division, Property Management Branch (PMB), headed by Kahapea, handled all commercial relocations in Ewa Villages. Commercial relocations could be accomplished in one of three ways: (1) a business could move and take a limited fixed payment based on its average net income, for expenses of up to $5000.00; (2) the City could hire a moving company through a procurement process that was controlled by the Purchasing Division of the Department of Budget and Fiscal Services; or (3) the tenant could move itself or hire a mover, and the City would reimburse the tenant for all "actual and reasonable" costs related to the relocation. Kahapea was responsible for verifying that relocations in the third category were completed and that the costs incurred were indeed "actual and reasonable." When the "claims expense form[s]" that Kahapea completed, together with supporting documents, were submitted to the DHCD, the City would issue checks to the respective moving companies.

Between 1993 and 1997, the City paid approximately six million dollars to the defendants Titan Moving and Hauling (Titan), R.J. Hauling (R.J.), A–1 Hawai'i Trucking and

---

1. HRPP Rule 35, entitled "Correction or Reduction of Sentence," provides in relevant part:

    **(a) Correction of Illegal Sentence.** The court may correct an illegal sentence at any time and may correct a sentence imposed in an illegal manner within the time provided herein for the reduction of sentence. A motion made by a defendant to correct an illegal sentence more than 90 days after the sentence is imposed shall be made pursuant to [HRPP] Rule 40 [(concerning post-conviction proceed-

    ings)].... A motion to correct a sentence that is made within the 90 day time period shall empower the court to act on such motion even though the time period has expired.

    **(b) Reduction of Sentence.** The court may reduce a sentence ... within 90 days after receipt by the court of a mandate issued upon affirmance of the judgment.... A motion to reduce a sentence that is made within the time prior shall empower the court to act on such motion even though the time period has expired....

Equipment (A–1), Specialty Pacific Builders, Inc. (SPB), and American Hauling (AH) for work ostensibly performed to relocate commercial tenants.[2] These reimbursements were based on false and forged documents submitted by Kahapea. Specifically, Kahapea presented blank "Agreement For Direct Payment To Mover" and "Claim For Payment Moving Expense" forms to tenants' representatives for their signatures. Later, Kahapea would complete the forms with false information and prepare false bids and invoices. In many instances, the relocations never took place.

Kahapea converted the reimbursement checks into cashier's checks and cash for his personal use. For example, Robert Eugene Oriskovich testified that Kahapea paid Oriskovich's travel expenses to Hawai'i. During Oriskovich's visits, Kahapea spent between $500 and $1500 per night at bars. Oriskovich testified that, on one occasion, Kahapea split a $10,000 tab with another person.

Kahapea's nephew, Michael John Barnett, testified that, between 1993 and 1997, he received approximately twelve cashier's checks from Kahapea, payable to him and totaling approximately $250,000.00. Barnett explained that Kahapea instructed him to "go to the bank and cash them and bring him back the money." Barnett testified that he did not do any commercial relocation work in Ewa Villages.

The defendant Claude Hebaru testified that he formed Titan at Kahapea's urging.

2. The following chart details the relocation reimbursements paid by the City to various moving companies for the purported relocations of commercial tenants in Ewa Villages:

| ALLEGED TENANT | TOTAL RELOCATION REIMBURSEMENT | ALLEGED MOVING COMPANY |
|---|---|---|
| Oahu Sugar Company | $ 3,300,000 * | A–1 ($339,000*)<br>AH ($160,000*)<br>R.J. ($890,000*)<br>SPB ($663,000*)<br>Titan ($1,200,000*) |
| Benton Post | $ 30,200 | Benton Post ("self-move") ($30,200) |
| Aloha State Tours | $ 183,850 | Titan ($183,850) |
| A–1 | $ 578,304 | A–1 ("self-move") ($521,374)<br>R.J. ($23,560)<br>Advance Electric ($33,370) |
| CMZ | $ 239,810 | R.J. ($171,490)<br>Titan Moving & Hauling ($68,320) |
| Transcend, Inc. | $ 298,975 | AH ($209,260)<br>Titan ($62,000 *)<br>Transcend, Inc. ("self-move") ($27,000 *) |
| PAFCO | $ 30,234 | Titan ($14,250)<br>Advance Electric ($15,984) |
| Independent Sandblasting | $ 253,080 | R.J. ($176,750)<br>Titan ($76,330) |
| Stan's Welding | $ 23,390 | Titan ($23,390) |
| Ewa Beauty and Barbershop | $ 86,800 | SPB ($86,800) |
| AH | $ 193,659 | AH ($159,479)<br>R.J. ($9,200)<br>Titan ($24,980) |
| American Welding | $ 593,934 | AH ($245,980)<br>R.J. ($95,685)<br>SPB ($40,297)<br>Titan ($197,490)<br>American Welding ($14,482) |

* approximate amounts

Between 1993 and 1997, Hebaru, doing business as Titan, received approximately two million dollars from the City for purported relocation work in Ewa Villages in which he did not participate. He testified that he gave Kahapea blank Titan letterheads, which Kahapea used to submit bid proposals. Kahapea would "write out the bids[,] . . . pull out everything, . . . and tell [Hebaru] afterwards that [they] got the job and all that." Thereafter, Kahapea would notify Hebaru that Kahapea had a City check for the purported relocation job and they would arrange to meet at the bank. At the bank, Hebaru exchanged the City's drafts for cashier's checks payable to individuals specified in Kahapea's written list. Approximately three thousand dollars would remain after every exchange. Hebaru testified that, between 1993 and 1997, he split approximately $400,000 "[a]lmost 50/50" with Kahapea.

In 1993, Benton K. Post, former maintenance manager for Aloha State Tours, met with Kahapea after the City notified Aloha State Tours that it would have to move. Post testified that Kahapea told him, "[Y]ou work hard and you should be entitled to some relocation money also." When Post informed Kahapea that he was not a tenant in Ewa Villages, Kahapea replied, "[N]o worry. [I]'ll take care of it." Thereafter, Kahapea provided Post with blank relocation forms and instructed him "[j]ust to sign" them. Kahapea also instructed Post to prepare invoices. Post testified that he received City checks, personally delivered by Kahapea, for relocation work that he did not do. When Kahapea gave Post a check, Kahapea would tell him that they needed to cash the check "right away." Post testified that Kahapea always instructed him to "get me about half."

The defendant David Brian Kaahaaina testified that he had previously worked for American Welding, which his parents owned. He first met Kahapea when Kahapea approached him about the cost to relocate American Welding. Kaahaaina submitted a $20,000 bid to relocate American Welding and received a City check for that amount. Thereafter, Kahapea contacted Kaahaaina regarding other relocation jobs and instruct-

ed him to submit bids that included "a little cushion on top." Kahapea further instructed Kaahaaina as to the particular language that he should include in his paperwork and requested blank letterhead with Kaahaaina's signature on the bottom. Kaahaaina testified that payments for purported relocation work were delivered by Kahapea. Upon delivery, Kaahaaina "would go and deposit the check into [his] account and take out that extra cushion and give that to [Kahapea]" in cash. Kaahaaina testified that he received altogether twenty to thirty City checks, totaling "between $700[,000] to $800,000," of which he gave "roughly $300[,000] to $400,000" to Kahapea.

In 1993, Shirley Hall, former vice president of A–1, met with Kahapea after the City notified A–1 that A–1 would have to relocate. Shirley testified that Kahapea gave A–1 jobs that involved "cleaning up" the residential and commercial areas of Ewa Villages. Although such jobs only required "cleaning up," Kahapea instructed Shirley to use the word "move" in all proposals she typed and directed her to use phrases like "[p]ropose to dismantle, crate, load, haul supplies and equipment from Ewa Villages to designated storage site."

The City paid A–1 for the purported relocations and Kahapea delivered the checks to Shirley. Shirley testified that her husband, the defendant Donald Hall, Sr., instructed her to go to the bank, deposit the checks, and withdraw cash, sometimes totaling $60,000. After Shirley gave the cash to Donald, he would meet with Kahapea and then return with "between 20 and 50 percent" less cash. Between 1993 to 1997, A–1 received approximately $700,000 to $800,000 in City checks, of which a little over $600,000 was taken in cash. Shirley testified that Kahapea took "at least half" of the $600,000.

The City's chief accountant, Michael Hansen, testified that, on June 28, 1997, he audited the Ewa Villages Revitalization Project after he received an inquiry about the fairness of the bid process. He reviewed all paperwork submitted and all checks issued for purported relocations in Ewa Villages. He testified that, between 1993 and 1997, there were approximately one hundred sev-

enty relocation claims submitted in connection with the Ewa Villages Relocation Project totaling $6,186,000.

After reviewing the City's checks and supporting documents, Honolulu Police Captain Daniel Hanagami, then in charge of the white collar crime unit, noticed that "[t]here were basically five companies being consistently awarded relocation services"—R.J., A–1, SPB, Titan, and AH. Captain Hanagami testified that, based on his review, he suspected "bid rigging." Captain Hanagami further testified that the information provided in the relocation claims revealed moving companies that shared telephone numbers and addresses. When Captain Hanagami attempted to locate the moving companies in the telephone book, only SPB was listed. Moreover, Captain Hanagami discovered that, after the City issued relocation checks, they were immediately cashed and converted into cashier's checks. When Captain Hanagami went to Ewa Villages to verify the relocation claims, he discovered that many of the named commercial tenants had not moved.

The Honolulu Police Department apparently arrested Kahapea in October 1997.

3. HRS § 708–830.5 provides in relevant part: "(1) A person commits the offense of theft in the first degree if the person commits theft: (a) Of property . . ., the value of which exceeds $20,000. . . . (2) Theft in the first degree is a class B felony."
HRS § 708–831 provides in relevant part: "(1) A person commits the offense of theft in the second degree if the person commits theft: . . . (b) Of property . . . the value of which exceeds $300. . . . (2) Theft in the second degree is a class C felony." Effective July 20, 1998 and July 1, 2005, the legislature amended this section in respects not germane to the present matter. 2005 Haw. Sess. L. Act 182, §§ 3, 7 at 579–80; 1998 Haw. Sess. L. Act 228, §§ 1, 4 at 775–76.
HRS § 708–852(1) provided in relevant part:
A person commits the offense of forgery in the second degree if, with intent to defraud, the person falsely makes, completes, endorses, or alters a written instrument, or utters a forged instrument, which is or purports to be, or which is calculated to become or to represent if completed, a[n] . . . instrument which does or may . . . affect a legal right, interest, obligation, or status.
Effective June 17, 1997, the legislature amended this paragraph in respects not germane to the present matter. 1997 Haw. Sess. L. Act 243, §§ 3, 5 at 487.

B. *Procedural Background*

1. *Conviction, sentence, and direct appeal*

On May 26, 1998, an Oʻahu grand jury returned an indictment against Kahapea and his codefendants. The indictment charged Kahapea with: (1) seventeen counts of theft in the first degree in violation of Hawaiʻi Revised Statutes (HRS) § 708–830.5(1)(a) (1993) (counts 1–8, 11–17, 19, and 21–25); (2) five counts of theft in the second degree in violation of HRS § 708–831(1)(b) (1993) (counts 9–10, 18, 20, and 26); (3) eleven counts of forgery in the second degree in violation of HRS § 708–852 (1993) (counts 27–37); (4) five counts of unlawful ownership or operation of business in violation of HRS §§ 842–2(3) (1993) and 842–3 (1993) (counts 38–42); (5) one count of money laundering in violation of HRS § 708–8120(1)(a) (1993) (count 43); (6) one count of money laundering in violation of HRS §§ 708A–3(a)(1)(A) (Supp.1995) and (d)(2) (Supp.1995) (count 44); (7) one count of bribery in violation of HRS § 710–1040(1)(b) (1993) (count 46); and (8) two counts of failure to report income in violation of HRS § 842–11 (1993) (counts 47–48).[3] Count 45 did not involve Kahapea.

HRS § 842–2 provides in relevant part: "It shall be unlawful: . . . (3) For any person employed by or associated with any enterprise to conduct or participate in the conduct of the affairs of the enterprise through racketeering activity or collection of an unlawful debt."
HRS § 842–3 (Supp.1999) establishes the range of penalties for organized crime, and is not germane to this appeal.
HRS § 708–8120(1) provided:
Any person who conducts or attempts to conduct a transaction involving a monetary instrument or instruments of a value exceeding $5,000 through a financial institution (a) with the intent to promote, manage, establish, carry on, conceal, disguise, or facilitate the promotion, management, establishment, carrying on, concealment, or disguising of any criminal activity, or (b) knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity, is guilty of the crime of money laundering.
Effective June 8, 1995, the legislature repealed this section and enacted HRS § 708A–3, *see infra.* 1995 Haw. Sess. L. Act 119, §§ 2–3, 5 at 190–91.
HRS § 708A–3 provided in relevant part:
(a) It is unlawful for any person:

From May 1, 2000 to August 2, 2000, the circuit court conducted a jury trial. In its verdicts signed July 26, 27, 28, and 31 and August 1, 2000, the jury found Kahapea: (1) guilty as charged of counts 1–8, 11–12, 15–19, 21–25, 27–44, and 46–48; (2) guilty of the included offense of theft in the second degree with respect to counts 13 and 14; and (3) not guilty of counts 20 and 26.[4]

After the circuit court read the verdicts, Kahapea orally moved for merger of the theft charges pursuant to HRS § 701–109 (1993).[5] After a hearing thereon, the circuit court ruled "that at ... the time of sentencing, ... Kahapea w[ould] be sentenced to counts 2, 4, 6, 8, 12, 14, 16, 19, 22, and 24," while counts 1, 3, 5, 7, 11, 13, 15, 17, 21, and 23 would "be[ ] deemed to have been merged as a matter of law." [6]

On August 17, 2000, the prosecution moved for consecutive terms of imprisonment.

> (1) Who knows that the property involved is the proceeds of some form of unlawful activity, to knowingly transport, transmit, transfer, receive, or acquire the property or to conduct a transaction involving the property, when, in fact, the property is the proceeds of specified unlawful activity:
> (A) With the intent to promote the carrying on of specified unlawful activity[.]
> ....
> (d) This section shall not apply to any person who commits any act described in this section unless:
> (1) The person believes the value or aggregate value of the property transported, transmitted, transferred, received, or acquired is $10,000 or more; or
> (2) The value or the aggregate value of the property transported, transmitted, transferred, received, or acquired is $10,000 or more.

Effective July 2, 1999, the legislature amended this section in immaterial respects. *See* 1999 Haw. Sess. L. Act 226, §§ 1, 4 at 712–13.

HRS § 710–1040(1) provides in relevant part:
> A person commits the offense of bribery if:
> ....
> (b) While a public servant, the person solicits, accepts, or agrees to accept, directly or indirectly, any pecuniary benefit with the intent that the person's vote, opinion, judgment, exercise of discretion, or other action as a public servant will thereby be influenced.

HRS § 842–11 provided in relevant part:
> Any law to the contrary notwithstanding, no person shall willfully fail to report income or to pay the taxes due thereon as provided by

On October 19, 2000, the circuit court conducted a hearing regarding Kahapea's sentence. The court entered oral findings of fact (FOFs) as follows:

> Kahapea flagrantly, without conscience and without shame, took advantage of his position as [PMB] *chief* in the [City]'s Housing Department *to manipulate* our state's relocation laws and *orchestrate* the theft of $5.8 million [from] the City ..., the taxpayers of the City ... and the [plaintiff-appellee] State [of Hawai'i [hereinafter, "the prosecution"]].
>
> He did so by means of a fraudulent and deceitful bid-rigging scheme and by dishonestly submitting fraudulent invoices for payment on the Ewa Villages relocation project.... Kahapea's scheme constituted the largest single theft of taxpayers' money by a public official in our state.
>
> *His criminal conduct spanned ... almost three years [and] involved the loss of*

chapters 235 or 237 [ (concerning income and general excise taxes) ].
Effective July 2, 1999, the legislature amended this language, *inter alia*, such that the unreported income must be "derived ... from a racketeering activity or through collection of an unlawful debt." *See* 1999 Haw. Sess. L. Act 227, §§ 2, 5 at 713–14.

4. The jury failed to reach a verdict on count 9, whereupon the circuit court declared a mistrial and later granted the plaintiff-appellee State of Hawaii's August 10, 2000 motion to *nolle prosequi*. Earlier, the circuit court dismissed Kahapea from count 10 on the prosecution's July 24, 2000 *nolle prosequi* motion.

5. HRS § 701–109, entitled "Method of prosecution when conduct establishes an element of more than one offense," provides in relevant part:
> (1) ... The defendant may not ... be convicted of more than one offense if:
> (a) One offense is included in the other....
> ....
> (4) ... An offense is ... included [in another] when:
> (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged....

6. The circuit court did not account for counts 18 and 25 here, but it later sentenced Kahapea to fines and no imprisonment under both of those counts. Also, despite listing count 13 as merged, the circuit court sentenced Kahapea to a $10,000.00 fine in connection therewith.

*millions of dollars during the most recessive economic period in the state's history.* He robbed the people of [']Ewa of the opportunity to revitalize their neighborhood [and] negatively impacted the [City]'s plans to build affordable housing units for the people of O[']ahu, depriving them of the opportunity for home ownership.

... *Kahapea lied* to his friends ... about what the money was going to be used for, and paid his friends back with money he stole from the taxpayers.

*He involved his stepdaughter* ... by having her fraudulently type documents for him, documents he knew would be used to deceive and steal taxpayers' money. *He used his son ... and his nephew* ... to cash cashier's checks he knew were illegal proceeds from his criminal action.

... Kahapea used his years of experience in the Housing Department, his specialized training, his knowledge of the regulations and even the recognition he received as employee of the year to betray the trust of his fellow workers. He lied to his secretary by providing her with false information to type....

He lied to his fellow employees in the finance department about the need to ex-

pedite the processing of City checks, ostensibly to help contractors meet the payroll but in reality for his own personal use and aggrandizement. He lied to his supervisors when they tried to find out what was going on.

... [H]e used taxpayers'[ ] money to bankroll his *high stakes gambling activities* ..., to lavish on himself and his friends *thousands of dollars in hostess bars,* and to invest hundreds of thousands of dollars into businesses with a farfetched dream of making a fortune ....

(Emphases added.) The circuit court then sentenced Kahapea, *inter alia,*[7] to five consecutive terms of imprisonment of ten years each,[8] one term for each of counts 2, 4, 6, 8, and 12.

On July 11, 2001, the prosecution requested an award of restitution against Kahapea. The circuit court found that Kahapea would have owed $1,705,974.00 but, due to Kahapea's then-insolvency, denied the prosecution's motion. On January 18, 2002, the circuit court entered its order denying restitution and finding in relevant part "that[,] as a result of [Kahapea]'s illegal ac-

---

**7.** With respect to the remaining charges of which Kahapea was found guilty, the circuit court sentenced him only to pay fines.

**8.** HRS § 706–660 (1993), entitled "Sentence of imprisonment for class B and C felonies; ordinary terms," provides that "[a] person who has been convicted of a class B or class C felony may be sentenced to an indeterminate term of imprisonment," subject to certain exceptions that are inapplicable here. "When ordering such a sentence, the court shall impose the maximum length of imprisonment which shall be as follows: (1) For a class B felony—10 years; and (2) For a class C felony—5 years. The minimum length of imprisonment shall be determined by the Hawaii paroling authority ...." *Id.*

HRS § 706–668.5 (1993), entitled "Multiple sentence of imprisonment," provides:

(1) If multiple terms of imprisonment are imposed on a defendant at the same time, ... the terms may run concurrently or consecutively. Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms run consecutively. Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms run concurrently.

(2) The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider the factors set forth in [HRS § ]706–606.

HRS § 706–606 (1993), entitled "Factors to be considered in imposing a sentence," provides:

The court, in determining the particular sentence to be imposed, shall consider:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed:

(a) To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;

(b) To afford adequate deterrence to criminal conduct;

(c) To protect the public from further crimes of the defendant; and

(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available; and

(4) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

tivities, [he] received for his benefit $1.7 million in public funds from the City."

On February 27, 2002, Kahapea filed his notice of appeal to this court, alleging that "(1) the circuit court erred in admitting testimony about his gambling history, (2) he was denied effective assistance of counsel, and (3) he did not voluntarily, knowingly and intelligently waive his right to testify." *State v. Kahapea*, No. 23882, summary disposition order at 1 (Haw. Oct. 6, 2004), 98 P.3d 246, 105 Hawai'i 375, 2004 WL 2245226 [hereinafter, "*Kahapea I* "]. On October 6, 2004, this court affirmed the circuit court's October 19, 2000 judgment. *Id.* at 3, 2004 WL 2245226, *2.

### 2. *HRPP Rule 35 proceedings*

On February 7, 2005, Kahapea timely moved for reconsideration and/or correction of his sentence pursuant to HRPP Rule 35, *see supra* note 1. In his motion, Kahapea urged the circuit court to correct its imposition of consecutive terms of incarceration. In particular, Kahapea argued: (1) that his "sentence . . . [wa]s extremely harsh as compared to . . . the sentences of the other defendants . . . and of defendants in other cases involving the theft of public funds" (referring by implication to *State v. Chun*, No. 1PC03-1-002376 (Haw. 1st Cir. Dec. 13, 2004), Ho'ohiki Doc. No. 37, and *State v. Eviota*, No. 1PC01-1-001587 (Haw. 1st Cir. Oct. 24, 2001), Ho'ohiki Doc. No. 6); (2) that "the [circuit] court's [FOF] at the time of sentencing that [Kahapea] was responsible for the theft of $5.8 million dollars[,] which was used as an aggravating factor[,] . . . was inconsistent with [its FOF] at the later restitution hearing that [he] received . . . $1.7 million dollars"; (3) that, "since the time of his initial incarceration, he has essentially been a model inmate"; (4) that he had past and present medical problems including a cancerous kidney that had been removed, high blood pressure, and a prostate condition; and (5) that he was "remorseful for the crimes that he committed and for the emotional scars that he caused his family and friends." (Capitalization omitted.) (Citing HRS § 706-606(4), *see supra* note 8.) Moreover, Kahapea argued that consecutive terms contravened his constitutional rights as interpreted by *Apprendi*,

530 U.S. at 490, 120 S.Ct. 2348. (Citing *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); *State v. Rivera*, 106 Hawai'i 146, 166–77, 102 P.3d 1044, 1064–75 (2004) (Acoba, J., dissenting).)

At the hearing on his motion, Kahapea argued:

> [T]here's . . . a very basic difference between how . . . we treat property crimes versus crimes committed against persons. . . .
>
> . . . [N]o matter how large the theft is, no matter how fraudulent the conduct is . . . [,] there is always that concern or that distinction and that . . . explains why the sentences handed down in [*Eviota* and *Chun* ] were far less than what you might see, for example, in typical violent Class A felonies like armed robbery, or forcible sexual assault, or kidnapping, or even manslaughter, which are all basically 20–year Class A felonies.
>
> . . . Kahapea's sentence . . . is more than double . . . what you would see for a 20–year Class A violent felony . . . .

With respect to the amount of stolen booty, Kahapea asserted:

> [W]hen the court sentenced [Kahapea], it had not . . . gone into any real depth about the precise amount of the loss . . . [W]hen the court got around to actually looking at numbers in the restitution proceedings, . . . the amount of loss was more like . . . one and a half million dollars[,] . . . a substantially lesser amount. . . .

Finally, Kahapea argued that he "ha[d] had a very positive and . . . productive attitude in terms of . . . his incarceration" and that his "large degree of notoriety . . . should limit any concern . . . about recidivism."

Kahapea offered, and the circuit court accepted into evidence, electronic minutes apparently recording certain codefendants' sentences: (1) Hebaru (a) received two concurrent sentences of five years each, and (b) was ordered to pay restitution (the Honorable Richard K. Perkins presiding); (2) Donald was ordered to pay restitution of $114,000.00 and serve five-year terms of probation, concurrently, one for each of six counts (the Honorable Wilfred K. Watanabe

presiding); (3) Kaahaaina was sentenced to five years' probation, 1000 hours of community service, and restitution of $127,711.25 (Judge Perkins); and (4) Donna Hashimoto-Abelaye was sentenced to two five-year terms of probation concurrent with each other and with a third, one-year, term of probation (Judge Perkins). Kahapea likewise submitted a copy of the circuit court's December 13, 2004 judgment in *Chun*, the Honorable Derrick H.M. Chan presiding, sentencing Jerrold Chun to concurrent ten-year terms of imprisonment for each of (1) three counts of third-degree theft, (2) one count of unlawful ownership or operation of a business, and (3) ten counts of money laundering; and to $4,603,107.70 in restitution. Kahapea further submitted a copy of the circuit court's October 24, 2001 judgment, Judge Perkins presiding, sentencing Fidel Eviota II(1) to three concurrent ten-year terms of imprisonment for first-degree theft, money laundering, and unlawful ownership or operation of a business; and (2) to restitution of $759,617.76. As evidence of his post-conviction character, Kahapea submitted certificates of completion: (1) dated December 14, 2001, of a "Cognitive Change & Violence Prevention" program; and (2) dated 2002, of a "Family Life and Parenting" class. Kahapea also affixed an evaluation of an apparent "estimator/tracker" job he did while incarcerated, rating him "excellent" in nearly every category and characterizing him as "creative and intelligent[,] ... very dependable and hard working." Finally, Kahapea submitted a February 12, 2005 letter, apparently from Prison Ministry Director Charles Nakashima, who wrote that Kahapea had "come to understand and accept the errors of his ways ... and grow from them" and that "Kahapea has changed his view on life and is seeking to be an asset to the community."

In his rebuttal argument, Kahapea stated with respect to *Apprendi*:

[W]e are going one step ... beyond [*Kaua v. Frank*, 350 F.Supp.2d 848 (D.Haw. 2004),] which related to the extended term statute which clearly extends the maxi-

mum term of the imprisonment, ... which is what happened in ... *Apprendi* ..... [W]e're ... saying by adding up ... the terms you get to basically the same result. And to the extent that certain facts need to be found before you can add things one on top of the other, ... that should be done ... by a jury.

The circuit court denied Kahapea's motion, concluding as follows:

[T]he court will distinguish Kahapea from Hebaru, from Chun, [and] from Eviota....

... [Hebaru] did come forward as I understand it. And that was the reason why ... Judge Perkins sentenced him to ... six months....

... *Chun* did not involve the use of public monies. They were trustee monies. They were an insurance company insolvency, a little bit different [than] this case.

....[9]

*It's my recollection that the [prosecution] proved up 1.3 million dollars in funds that [Kahapea] personally would be required to make restitution for out of the 3.7 that the prosecution had sought to get the court to order restitution for. Now whether or not 5.8 million was the total loss to the City ..., I don't know the answer to that. It was not something that I needed to really determine.*

... 54 witnesses, if I'm not mistaken, were called to testify .... It is the largest theft of any public funds or anyone thus far.

... [I]t involved someone who was given a position of responsibility and trust....

It involved monies that were going to be used for the renewal and revitalization of the Ewa Villages project. *Even assuming the number to have been 1.3 million dollars, this was 1.3 million dollars that a financially strapped city administration could ill afford to lose at the time.* It was a theft of funds not just from a particular entity such as an insurance company. *It*

9. The circuit court's oral summary of *Eviota* is unclear but, in its April 7, 2005 order denying Kahapea's motion, the court noted that "Eviota committed theft of ... substantially less ... public funds than ... Kahapea.

*was a theft of funds from all of us as taxpayers. The victims were numerous.*

. . . .

. . . [Kahapea] was the mastermind. *He . . . put this all together, a remarkable scheme in the court's view. He enticed not only people who had his trust but even innocent people. He knew their weaknesses, like [Hebaru], for example. He knew how he would be able to use them in the way that he saw fit.*

[This] was a case in which *there was such a waste of resources* . . . . [Kahapea] and his friends spent $10,000 one night at a Korean bar . . . .

*This is not just lavish life-style but this is . . . at taxpayers' expense.*

. . . *[E]ven his own [step]daughter['s] funds . . . w[ere] abused and stolen by [Kahapea].*

And I understand that [Kahapea] after eight years of being at H[ā]lawa has realized the error of his ways. But the court in sentencing him . . . took into account everything that he had done: the fact that he was the mastermind, the fact that he had come up with this universal scheme of theft and bribery and seduction in order to satisfy his own personal needs.

There were no mitigating factors in this case. *This is not a case like . . . Chun . . ., who paid the money back. This is a case . . . of a person who says at the end after all that is said and done, I have nothing to show for it.*

. . . *Kahapea has violated the trust of his friends, his family, all those who relied on government to do the right things* . . . . [W]hether or not it serves as deterrence, I'm sure there will always be property crime going into the future, but this case was remarkable with regard to the extent, the involvement of so many people, all leading to one person, and that is . . . Kahapea.

(Emphases added and formatting altered.) On April 7, 2005, the circuit court entered the following FOFs and conclusions of law (COLs):

3. . . . *Ap[p]rendi* . . . does not apply . . . since . . . Kahapea was not sentenced to an extended term or enhanced sentence.

4. . . . [T]he [circuit c]ourt exercised it[ ]s discretion within the range prescribed by statute after taking into consideration various factors relating to both the offense and [Kahapea].

5. . . . Kahapea had full knowledge of the possible sentences that could have been imposed by this [c]ourt.

. . . .

7. . . . Hebaru cooperated with law enforcement . . . and . . . agreed to testify against other defendants.

8. . . . Chun did not commit theft of public funds.

9. . . . Eviota committed theft of . . . substantially less . . . public funds than . . . Kahapea.

10. . . .

. . . .

b. . . . [T]he case involved the largest theft of public funds in the [City]'s history.

c. . . . Kahapea was in a position of trust at the time of the criminal offense.

. . . .

e. . . . Kahapea took public funds from a financially strapped City . . . [,] which could not have afforded a loss in the magnitude of funds involved.

f. . . . Kahapea's criminal conduct was not only a theft from the City . . ., but was a theft from taxpayers.

g. . . . [T]he City . . . had to expend additional funds . . . to uncover the extent and magnitude of the theft. . . .

h. . . . Kahapea was the "mastermind" who . . . devised the fraudulent scheme to take public funds from the City. . . .

i. . . . Kahapea used co-workers, family, friends, people who had financial weaknesses, and others who had trusted him to carrying out his fraudulent scheme.

j. . . . Kahapea used the public funds to support his lavish lifestyle as exhibited in an incident where he . . . spent $10,000.00 one night at a Korean [h]ostess bar.

k. . . . Kahapea went so far as to involve his [step]daughter in the fraudulent

278

scheme[,] which resulted in an abuse of her financial situation.

11. ... Kahapea took public funds for personal gain, breached the trust of family, friends and co-workers, and[,] unlike ... Chun, lacked the funds to repay the City ....

Accordingly, the circuit court concluded that its October 19, 2000 sentence "was and still is the appropriate sentence in this matter" and denied Kahapea's motion. On May 5, 2005, Kahapea filed a timely notice of appeal to this court.

## II. STANDARDS OF REVIEW

### A. Sentencing

[A] sentencing judge generally has broad discretion in imposing a sentence. The applicable standard of review for sentencing or resentencing matters is whether the court committed plain and manifest abuse of discretion in its decision.

"[F]actors which indicate a plain and manifest abuse of discretion are arbitrary or capricious action by the judge and a rigid refusal to consider the defendant's contentions." And, "[g]enerally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant."

State v. Rauch, 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000) (brackets in original) (internal citations omitted) (quoting Keawe v. State, 79 Hawai'i 281, 284, 901 P.2d 481, 484 (1995); State v. Fry, 61 Haw. 226, 231, 602 P.2d 13, 17 (1979)), quoted in State v. Gonsalves, 108 Hawai'i 289, 293, 119 P.3d 597, 601 (2005); State v. De Guair, 108 Hawai'i 179, 186, 118 P.3d 662, 669 (2005); State v. Maugaotega, 107 Hawai'i 399, 406, 114 P.3d 905, 912 (2005); State v. Koch, 107 Hawai'i 215, 219–20, 112 P.3d 69, 73–74 (2005); State v. Solomon, 107 Hawai'i 117, 126, 111 P.3d 12, 21 (2005); State v. Vellina, 106 Hawai'i 441, 446, 106 P.3d 364, 369 (2005); Rivera, 106 Hawai'i at 154–55, 102 P.3d at 1052–53; State v. Kamanao, 103 Hawai'i 315, 319, 82 P.3d 401, 405 (2003); State v. Hauge, 103 Hawai'i 38, 48, 79 P.3d 131, 141 (2003); State v. Kaua, 102 Hawai'i 1, 7, 72 P.3d 473, 479 (2003).

### B. Questions of Constitutional Law

"[This court] answer[s] questions of constitutional law 'by exercising [its] own independent ... judgment based on the facts of the case.' Thus, [this court] review[s] questions of constitutional law [']under the []right/wrong[] standard.' " State v. Arceo, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996) (quoting State v. Lee, 83 Hawai'i 267, 273, 925 P.2d 1091, 1097 (1996); State v. Trainor, 83 Hawai'i 250, 255, 925 P.2d 818, 823 (1996); State v. Toyomura, 80 Hawai'i 8, 15, 904 P.2d 893, 900 (1995); State v. Baranco, 77 Hawai'i 351, 355, 884 P.2d 729, 733 (1994)), quoted in State v. Bani, 97 Hawai'i 285, 289, 36 P.3d 1255, 1259 (2001).

## III. DISCUSSION

### A. Apprendi's Inapplicability to Consecutive Terms of Imprisonment

On appeal, Kahapea argues that the circuit court's imposition of consecutive terms of imprisonment contravenes the United States Supreme Court's decision in Apprendi on the basis that consecutive sentences are "analogous to the enhancement of sentencing" and, therefore, cannot be legally imposed in the absence of aggravating facts expressly alleged in the charging instrument and found by the jury to be proved beyond a reasonable doubt.

In its answering brief, the prosecution counters that "[j]udicial factfinding does not, on its own, violate the [s]ixth [a]mendment.... Apprendi applies to situations where the sentence is alleged to have exceeded the statutory maximum ... for a particular offense[,] not the aggregate effect that results when sentences for convictions on multiple counts are ordered to be served consecutively." (Emphases omitted.) (Citing HRS §§ 706–668.5 and 708–830.5(1)(a), see supra notes 3 and 8.)

In Apprendi, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a

jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348; *see also* 3 Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 526 & n. 58 (3d ed. 2004 & Supp.2005).

Admittedly, stacking Kahapea's multiple sentences together has the effect of enhancing the length of his incarceration beyond ten years, the statutory maximum for one first-degree theft, *see* HRS § 706–660, *supra* note 8. Nevertheless, none of Kahapea's five individual terms of imprisonment exceeded the statutory maximum. This court suggested in *Rivera* that the logic of the *Apprendi* rule did not apply to consecutive term sentencing:

> In the present matter, the circuit court had the discretion under HRS § 706–668.5 to sentence Rivera to serve two consecutive five-year indeterminate maximum terms of imprisonment for his convictions of class C felonies in Counts I and II because "multiple terms of imprisonment [were] imposed on [him] at the same time." Again, the circuit court would have been required to consider ·the factors set forth in HRS § 706–606[, *see supra* note 9]— including the need to "protect the public" contained in HRS § 706–606(2)(c)—when determining whether to impose consecutive or concurrent terms of imprisonment.
>
> [B]y the plain language of HRS § 706–668.5(2)—although subject, pursuant to HRS § 706–668.5(1), to presumptively concurrent sentencing in connection with multiple prison terms "imposed at the same time"—[ ] the sentencing court [is] obligated to "consider the factors set forth in [HRS § ] 706–606" when determining whether multiple indeterminate prison terms were to run concurrently or consecutively.
>
> . . . .
>
> . . . [T]he fact that HRS § 706–606 is incorporated by reference into HRS § 706–668.5 has profound significance. Bearing in mind that all indeterminate (including consecutive) prison terms are inherently incapacitative, the legislative sentencing philosophy permeating HRS ch. 706 in general and HRS § 706–606 in particular dictates that discretionary consecutive prison sentences, pursuant

> to HRS § 706–668.5, may properly be imposed only if the penal objectives sought to be achieved include retribution (*i.e.,* "just des[s]erts") and deterrence. [*State v.] Gaylord,* 78 Hawai'i [127, 149–]50, 890 P.2d [1167, 1189–]90 [ (1993) ].... Had the circuit court sentenced Rivera to consecutive terms of imprisonment in Counts I and II, the effect would have been a ten-year indeterminate maximum term of imprisonment, a term *equal* to the two *concurrent* ten-year extended terms of imprisonment that the circuit court actually imposed in this case. It defies logic that the circuit court could, consistent with *Blakely,* legitimately impose the same ten-year sentence, comprised of two consecutive five-year indeterminate maximum terms, under ordinary sentencing principles, but run afoul of *Blakely* by imposing concurrent ten-year extended terms of imprisonment based on the finding of prior or multiple concurrent convictions.

*Rivera,* 106 Hawai'i at 163–64, 102 P.3d at 1061–62 (some citations omitted) (some emphases and ellipses added and some in original) (some brackets added, some omitted, and some in original).

Confronting analogous situations, other jurisdictions, including several federal circuits, have aphoristically dismissed the proposition that either *Blakely* or *Apprendi* proscribes consecutive term sentencing, and this court does likewise. *See, e.g., United States v. Pressley,* 345 F.3d 1205, 1213 (11th Cir.2003); *United States v. Harrison,* 340 F.3d 497, 500 (8th Cir.2003); *United States v. Davis,* 329 F.3d 1250, 1254 (11th Cir.2003); *United States v. Chorin,* 322 F.3d 274, 279 (3d Cir. 2003); *United States v. Lott,* 310 F.3d 1231, 1242–43 (10th Cir.2002); *United States v. Sua,* 307 F.3d 1150, 1154 (9th Cir.2002); *United States v. Diaz,* 296 F.3d 680, 684 (8th Cir.2002) (en banc); *United States v. McWaine,* 290 F.3d 269, 276 (5th Cir.2002); *United States ·v. Buckland,* 289 F.3d 558, 570–71 (9th Cir.2002) (en banc); *United States v. Campbell,* 279 F.3d 392, 401–02 (6th Cir.2002); *United States v. Feola,* 275 F.3d 216, 220 & n. 1 (2d Cir.2001); *United States v. Parolin,* 239 F.3d 922, 929–30 (7th Cir.

2001); *United States ex rel. Thomas v. Hinsley,* 379 F.Supp.2d 924, 925 (N.D.Ill.2005); *Wright v. State,* 46 P.3d 395, 398 (Alaska Ct.App.2002); *Hall v. State,* 823 So.2d 757, 764 (Fla.2002); *People v. Wagener,* 196 Ill.2d 269, 256 Ill.Dec. 550, 752 N.E.2d 430, 441–42 (2001) ("[S]entences which run consecutively to each other are not transmuted thereby into a single sentence. Because consecutive sentences remain discrete, a determination that sentences are to be served consecutively cannot run afoul of *Apprendi,* which only addresses sentences for individual crimes."); *State v. Rannow,* 703 N.W.2d 575, 581 (Minn. Ct.App.2005) (citing *State v. Senske,* 692 N.W.2d 743, 747–48 (Minn.Ct.App.2005)); *State v. Higgins,* 149 N.H. 290, 821 A.2d 964, 975–76 (2003); *State v. Abdullah,* 372 N.J.Super. 252, 858 A.2d 19, 39 (Ct.App.Div.2004), *aff'd, rev'd on other grounds,* 184 N.J. 497, 878 A.2d 746, 756 & n. 6, 757 (2005); *People v. Murray,* 5 Misc.3d 636, 785 N.Y.S.2d 675, 677 (N.Y.Sup.Ct.2004); *State v. Lowery,* 160 Ohio App.3d 138, 826 N.E.2d 340, 355 (2005); *State v. Cubias,* 155 Wash.2d 549, 120 P.3d 929, 932 (2005), *followed by State v. Louis,* 155 Wash.2d 563, 120 P.3d 936, 940 (2005).

▆ In the present matter, Kahapea was convicted by the jury of five first-degree thefts, for each of which he was sentenced to ten years' incarceration. Pursuant to HRS §§ 706–660 and 706–668.5, five ten-year terms running consecutively *is* the statutory maximum; hence, Kahapea's sentence did not deprive him of his right to a jury trial as interpreted by the United States Supreme Court in *Apprendi* and *Blakely.*

B. *The Circuit Court's Denial of Kahapea's HRPP Rule 35 Motion Did Not Reflect "Plain and Manifest Abuse of Discretion."*

1. *The parties' arguments*

Kahapea essentially contends that the circuit court abused its discretion by not granting Kahapea's February 7, 2005 motion such that one or more of his five terms of imprisonment would run concurrently, which would effectively shorten his maximum prison sentence by some multiple of ten years.

Kahapea argues that "the circuit court made specific [FOF]s as obvious aggravating factors to justify its imposition of consecutive sentences of . . . Kahapea that . . . were clearly without basis and not supported by competent evidence," to wit, that "the case involved the largest theft of public funds in the [City]'s history" and that "Kahapea took public funds from a financially strapped City . . . which could not have afforded a loss in the magnitude of funds involved." Kahapea further urges that $1.7 million, the lesser and more recent of the two amounts of stolen funds that the circuit court acknowledged, "although substantial, was far less than . . . 5.8 million dollars . . . [,] upon which the circuit court had based its [FOFs] in imposing the five consecutive ten-year sentences of imprisonment on October 19, 2000."

Next, Kahapea objects to the circuit court's comparing him to Chun, who, unlike Kahapea, apparently had " 'the funds to repay the City.' " The circuit court could not, Kahapea asserts, " 'impose total confinement . . . in response to nonpayment resulting from [present] inability to pay [restitution].' " (Quoting *Gaylord,* 78 Hawai'i at 154, 890 P.2d at 1194 (brackets in original).)

Kahapea further implies that the circuit court misapplied HRS § 706–606(4), *see supra* note 8: "[T]he only other defendant . . . who served any jail time at all was . . . Hebaru, who was a major player in the . . . case. . . ." (Citations omitted.) According to Kahapea, the circuit court noted, contrary to fact, that "Hebaru cooperated with law enforcement authorities and had agreed to testify against other defendants."

Citing *State v. Tauiliili,* 96 Hawai'i 195, 199–200, 29 P.3d 914, 918–19 (2001), and *State v. Sinagoga,* 81 Hawai'i 421, 427, 918 P.2d 228, 234 (App.1996), in its answering brief, the prosecution argues that, "[a]bsent clear evidence to the contrary, it is presumed that a sentencing court will have considered all" of the criteria listed in HRS § 706–606.

Furthermore, the prosecution contends that the circuit court's order did not turn on an FOF precisely quantifying the amount of stolen money. In any case, the prosecution implies, the October 19, 2000 sentence could not have been illegal at the time because the

circuit court's FOF that Kahapea had stolen only $1.7 million occurred *after* sentencing, at its September 26, 2001 restitution hearing.

With respect to the comparative magnitude of Kahapea's crimes, the prosecution indicates that Kahapea

> was convicted of committing considerably more offenses than the other individuals to whom he compares himself.... [Kahapea], unlike ... his co-defendants, was undoubtedly the "mastermind," who "flagrantly, without conscience and without shame, took advantage of his position ... to manipulate [the] state's relocation laws and orchestrate the theft of $5.8 million."
>
> Additionally, and unlike [Kahapea], his co-defendants seemed to have taken responsibility, in varying degrees, for their roles in his "fraudulent and deceitful bid-rigging scheme." The [COL] is supported by [Kahapea]'s acknowledgment in his Resentencing Motion that[ ] "... Hebaru and ... Kaahaaina testified at trial for the [prosecution] pursuant to plea agreements.... Donald ... and ... Hashimoto–Abelaye did not testify at trial as they changed their pleas apparently without any agreement to testify, and they were awaiting sentencing at the time of trial." Finally, all co-defendants are repaying money ... they illegally received, and in no case is the amount as great as the "$1.7 million in public funds" the [circuit] court found that [Kahapea] had personally received....
>
> ... [Kahapea]'s reference to the sentences of other defendants merely illustrates a different sentencing court's discretion and does not demonstrate that the court that sentenced him abused its discretion in imposing consecutive terms of imprisonment.

(Some brackets in original and some added.)

### 2. *Analysis*

■ This court has not circumscribed the particular weight to be given the particular factors upon which Kahapea relies, but the circuit court's sentence is entitled to deferential appellate review. "The [circuit] court ha[d] discretion to make the punishment fit the crime[s], as well as the needs of the individual defendant and the community." *State v. Teves,* 4 Haw.App. 566, 573, 670 P.2d 834, 838 (1983); *State v. Pantoja,* 89 Hawai'i 492, 497, 974 P.2d 1082, 1087 (1999) ("In ordinary sentencing situations, the sentencing court is given a great deal of discretion to fashion an 'individualized' sentence, 'fitted to the personal characteristics of the defendant,' and 'the particular circumstances of the defendant's case.' ") (footnote omitted) (quoting *Keawe v. State,* 79 Hawai'i 281, 285, 901 P.2d 481, 485 (1995); *State v. Huelsman,* 60 Haw. 71, 85, 588 P.2d 394, 403 (1978)). Neither medical circumstances nor improvements in Kahapea's attitude are compulsory mitigators. As the Intermediate Court of Appeals stated in *Teves,* even "a disparity among [defendants'] sentences does not establish that any particular defendant's sentence is excessive." 4 Haw.App. at 572–73, 670 P.2d at 838.

The circuit court acknowledged that the amount of money that Kahapea stole could be as "little" as $1.3 million but implied that the precise amount was immaterial to the sentence it ultimately mandated; the circuit court reasonably placed greater significance on the number of *victims* and their "innocent bystander" status: "Even assuming the number to have been 1.3 million dollars, this was 1.3 million dollars that a financially strapped city administration could ill afford to lose at the time. It was a theft of funds not just from a particular entity such as an insurance company. It was a theft of funds from all of us as taxpayers. The victims were numerous."

■ With respect to Kapahea's argument that he should not be imprisoned " 'in response to nonpayment resulting from [present] inability to pay [restitution],' " (brackets in original) (quoting *Gaylord,* 78 Hawai'i at 154, 890 P.2d at 1194), Kahapea mischaracterizes this court's holding in *Gaylord.* In that case, the circuit court had sentenced the defendant to consecutive terms not because it "inten[ded] ... that [he] be imprisoned for an extended or enhanced period of time," but rather to prolong the HPA's "jurisdiction and control over [him] ... to· see to it that [he] makes full restitution." 78 Hawai'i at 134, 154, 890 P.2d at 1174, 1194 (emphasis omit-

ted). In light of the goals of incarceration enshrined in HRS ch. 706 and its commentary, this court stated in *Gaylord* that, "at the very least, (1) the sentencing court must expressly intend that the defendant's period of incarceration be prolonged by virtue of the consecutive character of the prison terms (the retributive goal), and (2) the sentence must embody the forward-looking aim of future crime reduction or prevention (the deterrent goal)." 78 Hawai'i at 154, 890 P.2d at 1194 (emphases omitted). It was because the trial court manifestly disregarded the foregoing propositions that this court vacated Gaylord's sentence. 78 Hawai'i at 155, 890 P.2d at 1195.

*Gaylord* is therefore distinguishable from the present matter. While sentencing Kahapea to consecutive terms, the circuit court evinced no such impermissible goal as securing restitution. At most, the circuit court implied that the fact that Kahapea squandered the ill-gotten gains that he otherwise could have returned as restitution was an aggravating consideration: "This is a case ... of a person who says at the end after all that is said and done, I have nothing to show for it." *Cf. State v. Mikasa*, 111 Hawai'i 1, 8, 135 P.3d 1044, 1051 (2006). Kahapea's implication that the circuit court punished him for being poor is pure *chutzpa*.

On balance, the record on appeal reflects that Kahapea effected a complicated scheme through the manipulation of others and at the profound and unrecoverable expense of taxpayers. *See supra* part I.A. While stern, the circuit court's sentence furthers the statutory penological goals of retribution, incapacitation, and deterrence and does not reflect "arbitrary or capricious action" or "a rigid refusal to consider the defendant's contentions." *See Rauch*, 94 Hawai'i at 322, 13 P.3d at 331.

### C. *Kahapea's Sentence Did Not Constitute Cruel and Unusual Punishment.*

■ In his remaining point of error, Kahapea alleges that his sentence constitutes cruel and unusual punishment. Citing *Solem v. Helm*, 463 U.S. 277, 292–93, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), he asserts that "the harshness of the penalty" in comparison to "the sentences imposed on others in this jurisdiction" renders it unconstitutional, particularly in light of: (1) his age at the time of sentencing (fifty-seven); (2) his "hav[ing] lived a law-abiding life for a substantial period of time before ... the present offenses"; (3) his crimes being "unlikely to recur"; and (4) the circuit court's decision not to impose extended terms of imprisonment.

The standard by which punishment is to be judged under the 'cruel and unusual' punishment provisions of both the United States and Hawai['i] Constitutions is[ ] whether[,] in the light of developing concepts of decency and fairness, the prescribed punishment is so disproportionate to the conduct proscribed and is of such duration as to shock the conscience of reasonable persons or to outrage the moral sense of the community.

*State v. Freitas*, 61 Haw. 262, 267–68, 602 P.2d 914, 920 (1979) (citing *State v. Iaukea*, 56 Haw. 343, 537 P.2d 724 (1975)), *quoted in State v. Jenkins*, 93 Hawai'i 87, 114, 997 P.2d 13, 40 (2000); *State v. Davia*, 87 Hawai'i 249, 258, 953 P.2d 1347, 1356 (1998); *State v. Loa*, 83 Hawai'i 335, 357, 926 P.2d 1258, 1279, 1280 (1996).

■ In part III.B.2, *supra*, we hold that, given (1) the destructive, deceitful, and wasteful, albeit nonviolent, character of Kahapea's offenses and (2) the primacy of the retributive, incapacitative, and deterrent objectives, five consecutive ten-year terms of imprisonment does not reflect a plain and manifest abuse of discretion on the part of the circuit court. *A fortiori*, such a sentence is not so disproportionate to Kahapea's crimes nor of such duration as to shock the conscience of reasonable persons or to outrage the moral sense of the community, in light of developing concepts of decency and fairness.

### IV. CONCLUSION

Accordingly, this court affirms the circuit court's April 7, 2005 order.

Concurring Opinion by ACOBA, J., with whom DUFFY, J., joins.

I concur, except insofar as the majority suggests that our sentencing scheme con-

forms to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), because in a particular case a consecutive sentence may be equated to an extended sentence. *See Kaua v. Frank*, 436 F.3d 1057, 1062 (9th Cir.2006) (holding that, based on its " 'intrinsic[-]extrinsic' analysis," "[t]he Hawaii Supreme Court's affirmance of [the defendant's] extended sentence [under Hawai'i Revised Statutes (HRS) § 706–662] was contrary to the U.S. Supreme Court's decision in *Apprendi* [ ]").

As the circuit court of the first circuit determined, "*Ap[p]rendi* ... does not apply ... since ... [Defendant–Appellant Michael Kahapea] was not sentenced to an extended term or enhanced sentence." The United States Supreme Court said in *Apprendi*, that "labels do not afford an acceptable answer[ ] ... as ... to the constitutionally novel and elusive distinction between elements and sentencing factors[ ] ... [because] the relevant inquiry is not of form, *but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?* " 530 U.S. at 494, 120 S.Ct. 2348 (emphasis added) (internal quotation marks and citations omitted) (brackets omitted). Thus, "when the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the *functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict.*" *Id.* at 496 n. 19, 120 S.Ct. 2348 (emphasis added).

In this case the ordinary maximum term for each of the relevant offenses is ten years' imprisonment. HRS § 706–660(2) (1993). Upon conviction, then, ten years' imprisonment would be the prescribed statutory maximum for each offense involved because ten years is the maximum sentence a judge may impose without any additional findings by a jury. However, HRS § 706–668.5 (1993) provides in relevant part that "[m]ultiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms run consecutively." The imposition of prison terms in consecutive sequence, then, does not result in "an increase beyond the maximum authorized statutory sentence," *Apprendi*, 530 U.S. at 496 n. 19, 120 S.Ct. 2348, *i.e.*, beyond one that can be imposed simply on the jury verdict and, thus, does not implicate *Apprendi* and its progeny.

However, the court's discretion in imposing a consecutive sentence is still circumscribed. *See, e.g., State v. Vellina*, 106 Hawai'i 441, 450, 106 P.3d 364, 373 (2005) (holding that it was plain error for the circuit court to sentence the defendant to consecutive prison terms based upon uncharged alleged misconduct); *State v. Gaylord*, 78 Hawai'i 127, 150, 890 P.2d 1167, 1190 (1995) (stating that "the imposition of consecutive prison terms *solely* for extraneous reasons, and to a defendant's substantial detriment, constitutes a plain and manifest abuse of discretion" (emphasis in original)); *State v. Kumukau*, 71 Haw. 218, 227, 787 P.2d 682, 688 (1990) (determining that the sentencing court abused its discretion when it imposed excessive, consecutive maximum terms for each and every count for which the defendant was convicted). The judge's decision to impose a consecutive sentence must still adhere to the criteria set forth in HRS § 706–606 (1993). That is, "[t]he court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider the factors set forth in section 706–606." HRS § 706–668.5 (1993).

In a particular case the total *indeterminate* sentence imposed by way of consecutive sentencing under HRS § 706–668.5(2) may potentially equal an extended sentence imposed under HRS § 706–662. This, however, does not support the conclusion that, in the absence of a jury finding, an extended sentence given under HRS § 706–662 [1] conforms

---

1. Hawai'i Revised Statutes § 706–662 (Supp. 2005) states in pertinent part as follows:

   **Criteria for extended terms of imprisonment.** A convicted defendant may be subject to an extended term of imprisonment under

section 706–661, if the convicted defendant satisfies one or more of the following criteria: (1) The defendant is a persistent offender whose imprisonment for an extended term is necessary for protection of the public....

to the precepts of *Apprendi* and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), as the majority has suggested in *State v. Rivera*, 106 Hawai'i 146, 156, 102 P.3d 1044, 1054 (2004), and in *State v. White*, 110 Hawai'i 79, 84–90, 129 P.3d 1107, 1112–18 (2006), and reiterated here. Majority opinion at ————, 141 P.3d at 451–52.

For an "ordinary" prison term imposed under HRS § 706–660 (1993) is subject to the factors set forth in HRS § 706–606.

> As applicable here, HRS § 706–660 authorizes, *inter alia*, an indeterminate "ordinary" prison term.... Applying HRS § 706–606, a sentencing court may consider any number of [the] factors [enumerated thereon] in deciding whether a defendant should be imprisoned.... While pursuant to HRS § 706–606 the court must *consider* ... multiple factors, ... [HRS § 706–606 does] not require[ ] ... [that] express facts [be found] ... as is required by HRS § 706–662 for an extended sentence.

*Rivera*, 106 Hawai'i at 174, 102 P.3d at 1072 (Acoba, J., dissenting) (emphasis in original) (some brackets in original and some added). *See also White*, 110 Hawai'i at 95, 129 P.3d at 1123 (Acoba, J., dissenting).

An ordinary prison term resting on consideration of HRS § 706–606 factors is to be distinguished from the imposition of extended terms under HRS § 706–662.

> Thus, the commentary to HRS § 706–660 draws a distinction between an "ordinary" indeterminate sentence under HRS § 706–660 and an enhanced sentence under a provision like HRS § 706–662:
>
> > With the exception of special problems calling for extended terms of incarceration as provided in subsequent sections,

(2) The defendant is a professional criminal whose imprisonment for an extended term is necessary for protection of the public.... (3) The defendant is a dangerous person whose imprisonment for an extended term is necessary for protection of the public.... (4) The defendant is a multiple offender whose criminal actions were so extensive that a sentence of imprisonment for an extended term is necessary for protection of the public....

it provides for only one possible maximum length of imprisonment for each class of felony....

> Once the court has decided to sentence a felon to imprisonment, the actual time of release is determined by parole authorities. Having decided on imprisonment, the court must then impose the maximum term authorized.
>
> ....
>
> *[T]his section embodies a policy of differentiating exceptional problems calling for extended terms of imprisonment from the problems which the vast majority of offenders present [.]*

*Rivera*, 106 Hawai'i at 174, 102 P.3d at 1072 (Acoba, J., dissenting) (emphasis in original) (footnotes omitted) (quoting Commentary on HRS § 706–660 (1993)). *See also White*, 110 Hawai'i at 96, 129 P.3d at 1124 (Acoba, J., dissenting). Hence, the penal code declares that "[t]he sentences provided in this section, [ (HRS § 706–660),] when compared to the extended sentences authorized in subsequent sections[, *i.e.*, HRS § 706–662,] seek to achieve the recommended explicit differentiation." *Rivera*, 106 Hawai'i at 175, 102 P.3d at 1073 (Acoba, J., dissenting) (quoting ABA Standards § 2.5). *See White*, 110 Hawai'i at 96, 129 P.3d at 1124 (Acoba, J., dissenting).

As noted in the *Rivera* dissent, an indeterminate consecutive sentence is qualitatively different from an extended sentence of ostensibly the same length.

> The fact that the two consecutive five-year terms amount to a ten-year indeterminate term ... does not mean that the minimum terms to be actually served as set by the paroling authority would be the same in both cases. The defendant who must serve an extended sentence faces a greater [Hawai'i Paroling Authority (HPA) ] mini-

(5) The defendant is an offender against the elderly, handicapped, or a minor under the age of eight, whose imprisonment for an extended term is necessary for the protection of the public.... (6) The defendant is a hate crime offender whose imprisonment for an extended term is necessary for the protection of the public....

mum sentence determination than the defendant who must serve consecutive terms, even when both sentences are [factually] quantitatively equal.

When setting a defendant's minimum sentence, the HPA considers six "aggravating" factors that "may be accorded weight *in favor of a longer minimum sentence* of imprisonment[,]" including whether the "inmate is a *persistent offender,* professional criminal, dangerous person, *multiple offender,* or offender against the elderly, handicapped or minor, *and sentenced to an extended period of imprisonment.*" Hawaii Administrative Rules (HAR) § 23–700–25(f) (1992) (emphases added). Thus, unlike a sentence of two consecutive five-year terms, a sentence of two ten-year *extended* terms to run concurrently exposes the defendant to a higher minimum sentence. Moreover, because the HPA considers the "prisoner's *criminal history* and character" in determining the minimum term of imprisonment, HRS § 706–669(8) (1993), it is free to consider *prior* extended terms. *See* HAR § 23–700–23(a) (requiring the HPA to consider the "nature and circumstances of the offense and *the history* and characteristics of the inmate") and *Guidelines for Establishing Minimum Terms of Imprisonment,* Hawai'i Paroling Authority (July 1989) (establishing that one of the "three areas of focus" in the guidelines is "the offender's *criminal history* " (emphasis added)). Should a defendant who has served an extended term be convicted of another crime in the future, the HPA would consider the prior extended term as part of the defendant's "criminal history." The effect, then, is that the defendant with an *extended* term on his or her record faces greater consequences than the defendant who merely serves consecutive terms.

*Rivera,* 106 Hawai'i at 176, 102 P.3d at 1074 (Acoba, J., dissenting) (emphases in original) (footnotes omitted). The "differentiation" between indeterminate "ordinary" sentences under HRS § 706–660 which may be imposed concurrently or consecutively as authorized under HRS § 706–668.5(2), and extended sentences under HRS § 706–662, inheres in the penal code's sentencing structure. Thus, under the express language of the penal code, consecutive sentences are not meant or intended to displace or replace extended sentences. It would appear plain, then, that our sentencing law does not sanction the circumvention by a judge of the extended term sentencing procedure by resort to the consecutive term provision. Such subterfuge would violate the provisions of the penal code and potentially raise serious due process considerations.