**Electronically Filed
Intermediate Court of Appeals
CAAP-16-0000115
29-SEP-2017
12:18 PM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---oOo---

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
MUSTAFA BAKER, Defendant-Appellant

NO. CAAP-16-0000115

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 13-1-0078)

SEPTEMBER 29, 2017

NAKAMURA, C.J., FUJISE AND CHAN, JJ.

OPINION OF THE COURT BY CHAN, J.

Defendant-Appellant Mustafa Baker (Baker) appeals from the "Judgment of Conviction and Sentence" entered on January 29, 2016 in the Circuit Court of the First Circuit (circuit court).[1] The State of Hawai'i (State) charged Baker with two counts of Sexual Assault in the First Degree (Counts 1 and 2) and one count of Sexual Assault in the Third Degree (Count 3). Right before

---

[1] The Honorable Karen S. S. Ahn presided.

jury selection, the circuit court dismissed Count 3 without prejudice because the complaint failed to allege the essential element that the defendant and complaining witness (CW) were not married to each other.[2] After a jury trial, Baker was found guilty of Counts 1 and 2:

> Count 1: Sexual Assault in the First Degree (penis into genital opening), in violation of HRS § 707-730(1)(a).[3]
>
> Count 2: Sexual Assault in the First Degree (penis into anal opening), in violation of HRS § 707-730(1)(a).

The circuit court sentenced Baker to consecutive terms of imprisonment of twenty years on Count 1 and twenty years on Count 2.

On appeal, Baker contends (1) the circuit court erred when it found that Baker's January 8, 2013 statement to the Honolulu Police Department (HPD) was voluntarily, knowingly, and intelligently made; (2) the circuit court erred when it redacted "I've been raped as a kid" from Baker's statement to HPD; (3) the

---

[2] Section 707-732 of the Hawaii Revised Statutes (HRS) (2014) provides in relevant part:

> § 707-732 Sexual Assault in the third degree. (1) A person commits the offense of sexual assault in the third degree if:
>
> . . . .
>
> (c) The person knowingly engages in sexual contact with a person who is at least fourteen years old but less than sixteen years old or causes the minor to have sexual contact with the person; provided that:
>
> (i) The person is not less than five years older than the minor; and
>
> (ii) The person is not legally married to the minor;
>
> . . . .

[3] HRS § 707-730 (2014) provides, in relevant part:

> § 707-730 Sexual Assault in the first degree. (1) A person commits the offense of sexual assault in the first degree if:
>
> (a) The person knowingly subjects another person to an act of sexual penetration by strong compulsion;
>
> . . . .

circuit court erred when it sentenced Baker to consecutive terms of imprisonment; and (4) the imposition of consecutive terms of imprisonment by a judge instead of by a jury violated the Sixth Amendment and Due Process clause.

## I. BACKGROUND

On December 31, 2012, CW, who was a seventeen-year-old minor at the time, and a friend went to Kailua District Park around 2:30 p.m. There, they met up with Baker, drank Jack Daniels and Bacardi, smoked marijuana, and may have also used acid and methamphetamine.

At around 5:30 p.m., a marked police car drove towards the group. In response, CW ran into the boys' bathroom to hide. Sometime later, Baker's minor relative GK arrived at the park.

When CW started walking out of the bathroom, she saw Baker and GK coming towards her, one of them holding a bottle. Baker and GK then proceeded to punch and hit CW. CW lost consciousness after GK hit her in the head with the bottle.

Before CW lost consciousness, she was wearing all of her clothes. When CW regained consciousness, she was completely naked and Baker had his penis inside of her vagina. At that moment, CW testified that she tried to fight back, but the more she fought, the more Baker and GK would punch and kick her. GK then said "he want[ed] to try," and put his penis in CW's vagina to have sex with her. After GK ejaculated, Baker turned CW around and "put his penis in [her] butt." CW testified, "I was telling him to stop, because it hurts. And he didn't really care what I said. And he just kept going." CW also testified that sometime after GK ejaculated, Baker put his penis back into her vagina and "ke[pt] going until he ejaculate[d]." CW testified that while Baker was having sex with CW, Baker "was dragging [her] all over," and CW "was bleeding from head to toe."

After the assault, CW heard either Baker or GK say to the other "[c]ome on. We got to go. The bus is here." After Baker and GK left, CW "crawled to the light" and asked a bystander to call 911.

Dr. Gregory Suares, the emergency room physician who treated CW, testified that CW had a broken jaw in two places, multiple lacerations to her head, scalp, and face, including significant lacerations requiring suturing to the top of both eyes and her lower lip, and abrasions and contusions on her body, including her hip and knees. Dr. Wayne Lee, an examining physician for the Sex Abuse Treatment Center (SATC), testified that he detected redness and swelling in the area of CW's external genitalia. He also detected tears or lacerations to CW's genitalia, which were consistent with trauma, and multiple tears or lacerations to CW's anus.

On January 8, 2013 at 6:45 p.m., HPD Detective Brian Tokita (Detective Tokita) interviewed Baker (Interview). During the Interview, Baker informed Detective Tokita that when he was about twelve years old, he took Ritalin for ADHD (Attention Deficit Hyperactivity Disorder) for about a year until his father took him off of it because he did not think Baker needed it.

Baker also told Detective Tokita that he had smoked "weed" the day before the Interview, in the afternoon. Detective Tokita asked Baker if he was well enough to give a statement, and Baker replied that he was. Detective Tokita then proceeded to read Baker his constitutional rights from HPD Form 81, entitled "Warning Persons Being Interrogated of Their Constitutional Rights."

Baker began telling Detective Tokita his account of what happened on the night of the assault. In response, Detective Tokita told Baker that he knew that was not true. Baker continued telling his account, and again, Detective Tokita told Baker that he knew Baker's story was untrue:

> Q: Okay, Mustafa, I know that's . . that's not how it went.
>
> A: I no blame nobody, I not saying nothing. That's what I know. I'm not defending myself, nothing, I just giving my story.
>
> Q: Okay, you know . . .
>
> A: This is a sad case . . .

4

```
Q:      . . . (inaudible)

A:      . . . I have . . I have sisters.  I have nieces.  I've
        been raped as a kid.  I no wish this on nobody.  I no
        pull that shit.
```

Detective Tokita told Baker that he knew Baker and GK beat CW and sexually assaulted her.  Detective Tokita further told Baker that he was "big on owning up."  Throughout the Interview, Detective Tokita and Baker discussed whether Baker had beat CW.  Baker never admitted to beating CW, other than just throwing her to the ground.

Detective Tokita also claimed that he had DNA evidence that Baker had sex with CW, and attempted to get Baker to admit that he had both vaginal and anal sex with CW.  At first, Baker only admitted to putting his penis in CW's vagina, but not in her anus.  However, eventually, Baker said, "I ain't going to argue with you no more," and admitted that he put his penis in CW's vagina and anus.

On January 16, 2013, Baker was charged with two counts of Sexual Assault in the First Degree (Counts 1 and 2) and one count of Sexual Assault in the Third Degree (Count 3).

On March 25, 2015, the State filed "Prosecution's Motion to Determine Voluntariness of Defendant's Statement to Law Enforcement" (Voluntariness Motion) to determine the voluntariness of Baker's statement made to Detective Tokita on January 8, 2013.  On March 31, 2015, a hearing was held on the Voluntariness Motion.  Detective Tokita testified at the hearing and admitted that at the time of the Interview, he did not have any objective DNA evidence despite having told Baker that he had "irrefutable evidence of his participation" in the assault.

Baker's counsel also asked Detective Tokita whether Baker stated that he had smoked marijuana in the twenty-four hours prior to the Interview.  Detective Tokita answered "yes," but testified that he clarified with Baker during the Interview that actually, "the 24 hours had passed and it was now evening the next day . . . ."  The court then asked Detective Tokita about his opinion of Baker's sobriety during the Interview:

THE COURT: Can I ask in your observation of him, observation both of his demeanor and in terms of what he said, was there any indication to you that he was feeling the effects of the marijuana?

[Detective Tokita]: No. And I even verbally asked him if he was well enough to give a statement, and he said yes.

At the end of the hearing, Baker's counsel argued that the audio recording of the Interview revealed "a lot of cajoling, and . . . some pretty clear denials, and . . . a lot of intimidation by [Detective Tokita] . . . ." In response, the State argued that "Mr. Baker, despite any sort of marijuana use, was very lucid and was certainly able, at least in the very beginning, to pedal [sic] the account that he wanted to until Detective Tokita pushed him further."

The circuit court took the Voluntariness Motion under advisement so it could listen to the audio recording of the Interview, and issued its ruling by minute order on April 1, 2015. In the minute order, the circuit court made the following findings and conclusions:

The court has reviewed the recording of defendant's January 8, 2013, statement to police and duly considered testimony, other exhibits, and arguments of counsel, and based thereon, finds and concludes as follows:

1. Before providing any substantive statement, the defendant was administered his Miranda rights and thereafter elected to waive those rights and provide a statement to police.

2. Although the defendant only completed the 8th Grade, the DVD demonstrates that he answered police questions readily and responsively, unless he reasonably wanted to think about the question and his answer. He displayed no signs of any inability to understand questions or to respond appropriately to any given question.

3. Defendant initially opted to deny any participation in the salient events at issue, but then admitted that he had been a participant.

4. During the interview, Honolulu Police Detective Brian Tokita engaged in apparently deceptive assertions regarding intrinsic facts and urged defendant to tell the truth, sometimes using an insistent tone, but did not use deliberate falsehoods extrinsic to the facts of the alleged offenses that were of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt.

6

> See State v. Kelekolio, 74 Haw. 479, 511 (1993).
> Where the defendant wanted to deny certain
> allegations, he did so.

> 5. Considering the totality of the evidence, the court
> concludes that the State has proven by a preponderance
> of the evidence that defendant gave the bulk of his
> January 8, 2013, statement voluntarily, knowingly, and
> intelligently. Under the totality of the
> circumstances, devices used by the detective did not
> amount to mental coercion and did not cause
> defendant's will to be overborne.

> 6. However, the court will deny the motion as to page 39
> through page 43 in the transcript, wherein the
> detective sought to get the defendant to admit that he
> directed [GK] to hit and assault the complaining
> witness, which [GK] did not want to do. Furthermore,
> the State will redact the pronoun "she" in questions
> inasmuch as that suggests that the detective is
> reciting material from the complaining witness'
> statements.

On April 1, 2015, the circuit court dismissed Count 3 without prejudice because the complaint failed to allege the essential element that the defendant and CW were not married to each other.

On April 7, 2015, out of the presence of the jury, the State proposed redacting the statement, "I have been raped as a kid," made by Baker during the Interview. Baker's counsel opposed the redaction, arguing that the statement supported the contention that Baker would not be violent in sexual activities because he has been a victim of violence. The circuit court granted the State's request to exclude the statement under Rule 403 of the Hawai'i Rules of Evidence (HRE).

On April 10, 2015, the jury returned its verdicts finding Baker guilty as charged in Counts 1 and 2.

On September 29, 2015, the State filed "Prosecution's Motion for Consecutive Sentencing Scheme" (Motion for Consecutive Sentencing). On January 29, 2016, the circuit court held a sentencing hearing, and granted the Motion for Consecutive Sentencing, sentencing Baker to forty years of imprisonment.

On January 29, 2016, the "Judgment of Conviction and Sentence" was filed.

On February 29, 2016, Baker filed his Notice of Appeal.

## II. STANDARD OF REVIEW

### A. Voluntariness of Statement

> We apply a *de novo* standard of appellate review to the ultimate issue of the voluntariness of a confession. We thus examine the entire record and make an independent determination of the ultimate issue of voluntariness based upon that review and the totality of the circumstances surrounding the defendant's statement.

State v. Gella, 92 Hawai'i 135, 142, 988 P.2d 200, 207 (1999) (internal quotation marks, citations, and brackets omitted) (quoting In re John Doe, 90 Hawai'i 246, 251, 978 P.2d 684, 689 (1999)). "However, it is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trial judge." Gella, 92 Hawai'i at 142, 988 P.2d at 207 (internal quotation marks and citation omitted).

> Our review of whether a defendant's statement was in fact coerced requires determination of whether the findings of the trial court are clearly erroneous. A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed.

Id. (internal quotation marks, citations, and brackets omitted) (quoting State v. Buch, 83 Hawai'i 308, 321, 926 P.2d 599, 612 (1996)).

### B. Admissibility of Evidence under HRE Rule 403

"Evidentiary decisions based on HRE Rule 403, which require a 'judgment call' on the part of the trial court, are reviewed for an abuse of discretion." Costales v. Rosete, 133 Hawai'i 453, 466, 331 P.3d 431, 444 (2014) (quoting Tabieros v. Clark Equip. Co., 85 Hawai'i 336, 350-51, 944 P.2d 1279, 1293-94 (1997)). "A trial court abuses its discretion when it 'clearly exceed[s] the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant.'" State v. Garcia, 135 Hawai'i 361, 368, 351 P.3d 588, 595 (2015) (quoting State v. Merino, 81 Hawai'i 198, 211, 915 P.2d 672, 685 (1996) (citations omitted)).

8

## C. Sentencing

> A sentencing judge generally has broad discretion in imposing a sentence. The applicable standard of review for sentencing or resentencing matters is whether the court committed plain and manifest abuse of discretion in its decision. Factors which indicate a plain and manifest abuse of discretion are arbitrary or capricious action by the judge and a rigid refusal to consider the defendant's contentions. And, generally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

State v. Mundon, 121 Hawai'i 339, 349, 219 P.3d 1126, 1136 (2009) (quoting State v. Kahapea, 111 Hawai'i 267, 278, 141 P.3d 440, 451 (2006)).

"The weight to be given the factors set forth in HRS § 706-606 in imposing sentence is a matter generally left to the discretion of the sentencing court, taking into consideration the circumstances of each case." State v. Akana, 10 Haw. App. 381, 386, 876 P.2d 1331, 1334 (1994).

## D. Constitutional Questions

"'We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard.'" State v. Vaimili, 135 Hawai'i 492, 499, 353 P.3d 1034, 1041 (2015) (quoting State v. Pratt, 127 Hawai'i 206, 277 P.3d 300 (2012) (citations and internal quotation marks omitted)).

## III. DISCUSSION

## A. Voluntariness of Baker's Statement

In his first point of error, Baker argues that the statements he made during the Interview with Detective Tokita were not voluntarily, knowingly, and intelligently made, and rather, were a product of coercion. Therefore, Baker argues that the entire Interview should have been inadmissible. We disagree.

### i. Baker's mental and physical condition

Baker contends that during the Interview, he was "still feeling the effects of [drug] withdrawal," "still feeling the effects of ADHD," and "suffering from stress, fear and

9

exhaustion."

> A defendant's mental and physical condition can be part of the totality of circumstances relevant to the issue of the voluntariness of his or her custodial statements. However, in the absence of insanity or mental depletion, neither the voluntary character nor the admissibility of a confession is affected by the mental instability of the person making it. Rather, the person's mental state is relevant only to the weight and effect to be given to the confession by the trier of fact.

State v. Kelekolio, 74 Haw. 479, 480-81, 849 P.2d 58, 60-61 (1993).

Although it is unclear whether Baker had smoked marijuana more than twenty-four hours prior to the Interview, or whether Baker was "feeling the effects of [drug] withdrawal" during the Interview, Baker told Detective Tokita that he was well enough to give a statement. Detective Tokita's statement that Baker had taken an "intox" several hours prior to the Interview also suggests that Baker was sober at the time of the Interview. At no time during the Interview did Baker suggest that his ADHD was having an effect on his mental or physical condition during the Interview itself. Rather, Baker's ADHD was brought up by Detective Tokita to suggest that perhaps the ADHD had caused Baker to "snap" on the night of the assault.

With regard to Baker "suffering from stress, fear and exhaustion" during the Interview, this argument was not raised at the hearing on the Voluntariness Motion nor during trial, and was raised for the first time on appeal. "As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal[.]" Asato v. Procurement Policy Bd., 132 Hawai'i 333, 354 n.22, 322 P.3d 228, 249 n.22 (2014) (quoting State v. Moses, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003)). Regardless, we conclude that this argument lacks merit.

"A confession may be rendered involuntary by impermissible police conduct." Kelekolio, 74 Haw. at 503, 849 P.2d at 70 (citations and internal quotation marks omitted). At no point during the Interview did Baker complain that he was

exhausted or tired.  During the Interview, Baker stated that he was scared, however, he did not indicate that his fear was caused by any improper conduct by Detective Tokita.

```
Q:    So what, why did you hit her and why did you hit her
      like that?  I mean was it the alcohol, you just like
      snapped or like . . .

A:    I was scared.

Q:    Scared of what, though?

A:    I didn't want to remember.

Q:    You didn't want to remember what happened?

A:    Yes.

Q:    So what are you going . . .

A:    And I'm still fuckin' scared and shit.
```

After reviewing the transcript and audio recording of the Interview, we conclude that Baker's statement that he was "still" scared did not stem from any impermissible police conduct.  The audio recording of the Interview reveals that Detective Tokita kept a calm tone of voice throughout the Interview.  In addition, the recording shows that Baker was lucid throughout the Interview, as demonstrated by his tone of voice, his ability to tell multiple versions of what happened on the night of the assault, his responsive answers to Detective Tokita's questions, and his consistent denial of beating CW.

Therefore, it is apparent from the "totality of circumstances" that Baker's mental and physical condition at the time of the Interview with Detective Tokita did not render his statement involuntary.

## ii.  Detective Tokita's tactics

We next consider Baker's argument that his statement was rendered involuntary because Detective Tokita "constant[ly] badger[ed]" Baker and "did not merely use falsehoods regarding intrinsic facts or 'exhortations to tell the truth.'"  In particular, Baker seems to allege that Detective Tokita improperly 1) suggested that Baker beat CW and assaulted CW anally, 2) raised the threat of media publicity, and 3) lied to

Baker about having physical evidence linking him to the assault.

In Kelekolio, the defendant argued that the detective interviewing him acted improperly by challenging the completeness of the defendant's story and by urging him to tell "the whole story." In rejecting this argument, the supreme court held that "[m]ere advice from the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or promise does not render a subsequent confession involuntary." Id. at 505, 849 P.2d at 70 (citations and quotation marks omitted). The Kelekolio court further noted that "the proposition that a police interrogator's unwillingness to accept a suspect's initial version of events at face value amounts to 'coercion' per se is not only naive and disingenuous, but falls of its own weight; were we to accept it, the legitimate right of law enforcement agencies to seek voluntary confessions would be rendered nugatory." Id.

In the instant case, Detective Tokita refused to accept Baker's "initial version[s] of events" that he had not been involved in a sexual assault, had not beaten CW, and had not assaulted CW anally. Detective Tokita persistently urged Baker to "come clean" and "own up." However, Detective Tokita never made any threats or promises to Baker.

We are also unconvinced that Detective Tokita "raised the threat of media publicity" during the Interview.

Q:    . . . . You know, I'm giving you a shot by telling me and this is how you . . how you want to be remembered, dude?

A:    No.

. . . .

Q:    . . . . Let me tell you what it sounds like on the outside. The girl's a minor. So she's not an adult.

A:    Yeah.

Q:    Okay, so in . . in people's minds, you know, if this hits the media, it would be . . .

A:    I know.

Q:    . . . twenty-three year old boy rapes a fucking juvenile and how does that sound?

A:    That's not me.

. . . .

Q:    I know you're not like that. . . . But it's time to
      come clean.  You got . . you got to responsibility for
      what you did, you know what I'm saying?

A:    Right.

Q:    When you go to court, you think people want to hear
      somebody that's going to fucking deny, deny when the
      evidence is like insurmountable against them, but
      they're just going to deny, deny to the bitter end . .
      .

A:    No.

Q:    . . . or you think they're be . . they want to hear
      somebody that's you know what, fuck, I made a mistake,
      period.  I made a mistake, that's . . that's not me,
      but I made a fucking mistake, I did and I'm sorry.
      What do you think they want to hear?

A:    The truth.

Again, Detective Tokita's line of questioning was directed at
getting Baker to tell the truth.  Detective Tokita never
threatened to publicize the details of the assault if Baker did
not tell a particular story.  Rather, Detective Tokita advised
Baker to tell his side of the true story, and insinuated that
people would rather hear Baker own up to his actions than deny
the truth, which, under Kelekolio, would constitute "[m]ere
advice from the police that it would be better for the accused to
tell the truth . . . unaccompanied by either a threat or promise
. . . ."  Id.

        Baker also argues that Detective Tokita improperly lied
to Baker about having physical evidence linking him to the
assault.  In Kelekolio, the defendant argued that the HPD
detective, Detective Kim, had deliberately misrepresented the
existence of incriminating evidence of sexual activity and
bruises on the complainant, thus coercing a confession from
Kelekolio.  Id. at 505, 849 P.2d at 71.  In resolving this claim,
the supreme court formulated a rule to measure the legitimacy of
the use of "deception" by the police in eliciting confessions or
inculpatory statements from suspects and arrestees, which

> is that employment by the police of deliberate falsehoods
> *intrinsic* to the facts of the alleged offense in question
> will be treated as one of the totality of circumstances
> surrounding the confession or statement to be considered in
> assessing its voluntariness; on the other hand, deliberate
> falsehoods *extrinsic* to the facts of the alleged offense,
> which are of a type reasonably likely to procure an untrue
> statement or to influence an accused to make a confession
> regardless of guilt, will be regarded as coercive per se,
> thus obviating the need for a "totality of circumstances"
> analysis of voluntariness.

Id. at 511, 849 P.2d at 73 (emphasis added).[4]  The Kelekolio court noted that an "example[] of [an] *intrinsic* falsehood[] would [be a] misrepresentation[] regarding the existence of incriminating evidence as . . . physical evidence linked to the victim found in the defendant's car, *see* [People v. Thompson, 50 Cal. 3d 134, 150, 785 P.2d 857, 863 (1990)] . . . ." Kelekolio, 74 Haw. at 511, 849 P.2d at 73.  Accordingly, the supreme court held that Detective Kim's deliberate misrepresentations regarding the existence of evidence of sexual activity and bruises incriminating Kelekolio were falsehoods intrinsic to the facts of the alleged offense, and were to be considered as a part of the totality of circumstances surrounding Kelekolio's statement.  Id. at 513, 849 P.2d at 74.  The supreme court further held that because Detective Kim's "misrepresentations were not of a type that would reasonably induce a false confession," his "use of deception did not render Kelekolio's inculpatory statements involuntary." Id.

---

[4]    The Kelekolio court noted that this rule was to be applied on a case-by-case basis, and was not intended to be a bright line rule:

> Notwithstanding our holding, we emphasize that we are not
> purporting to enunciate a bright line per se rule that the
> use of intrinsic factual deception cannot, given the
> totality of circumstances surrounding any given statement,
> result in an involuntary confession. Rather, the rule that
> we formulate today merely declines to foreclose the
> admissibility of confessions, as a per se matter, procured
> in part through the use of this kind of deception. Such
> confessions remain subject to "totality of circumstances"
> analysis . . . and may still be the product of interrogation
> techniques that are "'so offensive to a civilized system of
> justice'" that "'they must be condemned'" under principles
> of due process . . . .

Kelekolio, 74 Haw. at 513-14, 849 P.2d at 74 (citations omitted).

Here, Detective Tokita's misrepresentations to Baker were substantially similar to the misrepresentations made by Detective Kim to Kelekolio. During the Interview, Detective Tokita told Baker multiple times that he had physical evidence that Baker had sexually assaulted CW, when in fact, Detective Tokita had no such physical evidence. Pursuant to Kelekolio, Detective Tokita's misrepresentations regarding the existence of physical evidence incriminating Baker were falsehoods intrinsic to the facts of the alleged offense, to be considered as a part of the totality of circumstances surrounding Baker's statement.

Based on our consideration of the totality of the circumstances surrounding Baker's statement, we conclude that Detective Tokita's questioning was not of a type that would reasonably induce a false confession, thus, Detective Tokita's questioning tactics did not render Baker's statements involuntary.

B. **Exclusion of "I've been raped as a kid" under HRE Rule 403**

In his second point of error, Baker contends that the circuit court erred when it redacted "I've been raped as a kid" from Baker's statement made during his Interview with Detective Tokita. Specifically, Baker argues that the statement was improperly excluded under HRE Rule 403 because the statement was relevant to support the inference that as a victim of rape himself, Baker would not and did not subject CW to "strong compulsion,"[5] a required element of sexual assault in the first degree under HRS § 707-730(1)(a). Baker also argues that the exclusion of the statement deprived him of his constitutional right to present a complete defense.

---

[5] HRS § 707-700 (2014) defines "strong compulsion":

"Strong compulsion" means the use of or attempt to use one or more of the following to overcome a person:

(1)   A threat, express or implied, that places a person in fear of bodily injury to the individual or another person, or in fear that the person or another person will be kidnapped;
(2)   A dangerous instrument; or
(3)   Physical force.

15

HRE Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, *confusion of the issues, or misleading the jury*, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." (Emphasis added.) The commentary of HRE Rule 403 explains that the rule seeks to prevent "engendering juror prejudice . . . sympathy . . . potential for confusion or distraction . . . . [or] an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." HRE Rule 403 cmt. The Rules of Evidence seek to bar prejudicial evidence of slight probative value that "tends to distract the trier of fact from the main question of what actually happened on the particular occasion. . . . despite what the evidence in the case shows actually happened." See HRE Rule 404 cmt. (citations omitted).

In excluding the statement, "I've been raped as a kid," the circuit court explained:

> THE COURT: Okay. And your record is made. I have three problems.
>
> Number one, "I've been raped as a kid." If there's nothing more, we just really have no -- very little idea as to what that precisely means. "As a kid," I mean, what age are we talking about? What does "rape" mean? I mean, this is a boy. And it could be touching. It could be a number of things.
>
> But, more than that, I think the inference that the defense wants the jury to draw is that because he's been raped as a kid he wouldn't rape someone else. And I don't -- and there are -- that might be an inference. But you could infer as well that, you know, kids who are abused become abusers themselves. So I think that's something that we should mention.
>
> But more -- the more importantly, I think the tendency is to feel sorry for someone. And as we know from the jury instructions, sympathy is absolutely verboten as to the jury. I think that that creates undue prejudice, which substantially outweighs this inference that the defense wishes the jury to draw, which as I say, it's one inference. But I don't think the only possible inference.
>
> And so, under 403, I'm going to deny the defense's request to include this one portion of the sentence.

We conclude that the circuit court did not abuse its discretion in excluding the challenged statement.

As offered by Baker, and not by the State, Baker's statement that he was raped as a child constitutes hearsay, but Baker sought to use the statement for the truth of the matter asserted. See HRE Rules 801 and 803(a)(1). Baker's claim that he had been raped as a child was devoid of any significant details or surrounding circumstances, such as the nature of the alleged rape, when it occurred, and who the perpetrator was. Also, as noted by the circuit court, even if Baker had been subjected to rape as a child, this does not necessarily suggest that he would not have subjected another person to sexual assault by strong compulsion. Therefore, the statement had little probative value in proving that Baker did not subject CW to strong compulsion.

On the other hand, the statement's potential for unfairly prejudicing, confusing, or misleading the jury was quite high. As stated above, it is unclear what the term "rape," as used by Baker, entailed, and therefore, the statement could have easily confused or misled the jury. More notably, the statement could have elicited sympathy from the jury, which could have caused them to make their decision on an emotional basis, or distracted them from the main question of what actually happened on the night of the assault.

Next, we address Baker's claim that the exclusion of the statement deprived him of his constitutional right to present a complete defense that he did not subject CW to strong compulsion. "The due process guarantee of a fair trial under the fourteenth amendment to the United States Constitution and article 1, section 14, of the Hawai'i Constitution confers upon the accused in criminal proceedings 'a meaningful opportunity to present a complete defense.'" State v. Pulse, 83 Hawai'i 229, 246, 925 P.2d 797, 814 (1996) (quoting State v. Matafeo, 71 Haw. 183, 185, 787 P.2d 671, 672 (1990)), *amended on reconsideration in part*, 83 Hawai'i 545, 928 P.2d 39 (1996). This right,

however, may be subject to appropriate limitations imposed by the rules of evidence. See State v. Pond, 118 Hawai'i 452, 463-64, 193 P.3d 368, 379-80 (2008).

In any event, Baker was able to present other evidence that he did not subject CW to strong compulsion. For instance, the jury was presented with Baker's Interview with Detective Tokita, which revealed Baker's consistent denials of beating CW. GK, who allegedly committed the assault with Baker, also testified at Baker's trial that Baker did not beat CW or cause any of her injuries.

[State]:    Okay. So you're telling us today that defendant did not cause any injuries to [CW] that night. Is that what you're saying?

[GK]:       Yes.

[State]:    You caused all the injuries on her body?

[GK]:       Yes.

. . . .

[Defense]:  And so, like on line 26, he asks you, "You bashed her over the head with the bottle. I know you did." And you answered, "I did." Now, [Baker] never hit -- you never saw [Baker] hit [CW] with a bottle, correct?

[GK]:       No.

[Defense]:  Never saw [Baker], [CW], hit [CW] -- [Baker], hit [CW] with his fist?

[GK]:       Yeah.

[Defense]:  Never saw him kick?

[GK]:       Never.

[Defense]:  Never saw rip off any clothes?

[GK]:       No.

Therefore, we conclude that Baker was able to present a complete defense that he did not subject CW to strong compulsion.

Accordingly, Baker has failed to establish that the circuit court "clearly exceeded the bounds of reason or . . . disregarded rules of principles of law or practice" in excluding Baker's statement that he "was raped as a kid." See State v. Merino, 81 Hawai'i 198, 211, 915 P.2d 672, 685 (1996) (citations

omitted).

## C. Imposition of Consecutive Sentencing

In his third point of error, Baker argues that the circuit court's imposition of two consecutive sentences constituted an abuse of discretion and "cruel and unusual punishment."

### i. Abuse of discretion

Under HRS § 706-668.5 (Supp. 2016), the court may order that multiple terms of imprisonment run consecutively or concurrently upon consideration of the factors set forth in HRS § 706-606.[6] HRS § 706-606 (2014) provides:

> The court, in determining the particular sentence to be imposed, shall consider:
> (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) The need for the sentence imposed:
>    (a) To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;
>    (b) To afford adequate deterrence to criminal conduct;
>    (c) To protect the public from further crimes of the defendant; and
>    (d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) The kinds of sentences available; and
> (4) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

In ordering that Baker's two twenty-year terms of imprisonment run consecutively, the circuit court gave the following reasoning:

---

[6] HRS § 706-668.5 provides in relevant part:

**HRS § 706-668.5 Multiple sentence of imprisonment.** (1) If multiple terms of imprisonment are imposed on a defendant, whether at the same time or at different times, or if a term of imprisonment is imposed on a defendant who is already subject to an unexpired term of imprisonment, the terms may run concurrently or consecutively. Multiple terms of imprisonment run concurrently unless the court orders or the statute mandates that the terms run consecutively.

(2) The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider the factors set forth in section 706-606.

THE COURT: What about -- okay. Well, you know, it's a tough -- it's not the easiest decision. The defendant has little to no record. He's young. He has family support. On the other side of the ledger, this girl was -- you know, she was a minor, and I -- you know, I take judicial notice of the files and records and of the trial proceedings. And the injuries were quite serious. She had facial fractures, jaw broken in two places, facial lacerations which will result in permanent scars.

And I remember her testifying -- Mr. Baker. I remember her testifying on the stand, and she seemed terrified. I also did listen to the entire statement that the defendant gave to the police, and I believe that he did not completely tell the truth. He said, among other things, that it was [GK] who did everything, and, in fact, [GK] got up at the trial and tried to testify to that effect. And the jury obviously did not buy it. They did not believe him.

But let's see. The -- in the face of that, I know that the complaining witness testified unequivocally to identify the defendant as the person who did rape her not once but twice and described his conduct in detail. The defendant has taken no responsibility at any time, and he even told the police that at the end of this episode, he tried to help the girl and she said no. He stood up, pulled himself -- put his clothes on, or whatever it was he did, I can't remember, but he stood up and he said, "Come on, let's go. The bus is coming." And left -- they left them -- they left the girl there. That's --

You know, sexual assault is always violent, but this was vicious. And I feel for the family because, as is often the case, they take it in the neck whether you go for 20 or 40, Mr. Baker. And they're going -- you know, it happens a lot, and I'm sorry for that. But that's not something the Court -- well, it's something the Court can consider, but it's, you know -- it's one of many factors.

I have to look -- in deciding whether consecutive is appropriate here, I have to look at the factors under 706-606, I think it is, and those include the nature and circumstances of the offense. And, Mr. Baker, this was one of the most vicious sexual assaults I have ever seen.

History and characteristics of the defendant -- I take it that you -- there's -- I'm sure there's a good side to you, and that's what your family sees. But the facts of this case show another side certainly.

And the Court also has to consider the need for the sentence to reflect the seriousness of the offense -- very serious -- to promote respect for the law and to provide just punishment for the offense and to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. I don't know if 20 years is going to be sufficient.

So I consider all of that in accordance with the factors under 706-606, and I am going to grant the motion for consecutive sentencing. So in Count I you will serve a

term of imprisonment of 20 years, and in Count II you will serve a term of imprisonment of 20 years. The second count's sentence will run consecutive to the first count.

On appeal, Baker argues that the circuit court "gave little to no consideration to Baker's personal history." We disagree. The circuit court considered Baker's minimal criminal record, young age, and family support, and the effect that Baker's incarceration would have on his family. The circuit court also recognized that Baker surely had a "good side to [him]," but focused on his characteristics brought to light by the instant assault.

Baker further argues that his forty-year sentence is inconsistent with "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," by pointing out that GK, who committed the assault with Baker, would be facing considerably less jail time than Baker, since GK was a minor at the time of the assault. We previously held that "there is no constitutional requirement that the court impose uniform sentences on multiple defendants involved in the same criminal activity, and a disparity among the sentences does not establish that any particular defendant's sentence is excessive. The court has discretion to make the punishment fit the crime, as well as the needs of the individual defendant and the community." State v. Teves, 4 Haw. App. 566, 572, 670 P.2d 834, 838 (1983). Here, both Baker and GK were involved in the same or very similar criminal activity. However, GK was sentenced to a much shorter term of imprisonment because GK was a minor at the time of the assault. Accordingly, the disparity among Baker's and GK's sentences does not establish that Baker's sentence is excessive.

We next address Baker's contention that the circuit court improperly considered Baker's refusal to take "responsibility at any time" in imposing Baker's enhanced sentence. In State v. Kamana'o, 103 Hawai'i 315, 316, 82 P.3d 401, 402 (2003), the supreme court held that "a sentencing court may not impose an enhanced sentence based on a defendant's

21

refusal to admit guilt with respect to an offense the conviction of which he intends to appeal." However, the Kamana'o court noted:

> We are aware that it is well settled that a sentencing court may consider a defendant's lack of remorse in assessing the likelihood of successful rehabilitation. See, e.g., Jennings v. State, 339 Md. 675, 664 A.2d 903, 910 (1995) ("[A] sentencing court may consider, on the issue of a defendant's prospects for rehabilitation, the defendant's lack of remorse."); State v. Tiernan, 645 A.2d 482, 486 (R.I.1994) (holding that the sentencing court properly considered the "defendant's refusal to acknowledge guilt for the limited purpose of assessing defendant's potential for rehabilitation"); State v. Clegg, 635 N.W.2d 578, 581 (S.D.2001) ("[A] defendant's remorse and prospects for rehabilitation are proper considerations in sentencing."); State v. Fuerst, 181 Wis.2d 903, 512 N.W.2d 243, 247 (Ct.App.1994) ("[A] sentencing court does not erroneously exercise its discretion by noting a defendant's lack of remorse as long as the court does not attempt to compel an admission of guilt or punish the defendant for maintaining his innocence."); cf. State v. Nooner, 114 Idaho 654, 759 P.2d 945, 946-47 (Ct.App.1988) (concluding that, inasmuch as the sentencing court "did not rely solely upon Nooner's continued denial of guilt" after his conviction, such a consideration, "in light of all the evidence presented, did not constitute error").

Id. at 321, 82 P.3d at 407.

In stating that "[Baker] has taken no responsibility at any time," the circuit court did not appear to be considering Baker's maintenance of his innocence, but rather, his lack of remorse. This is supported by the circuit court's following remarks regarding how right after the assault, Baker and GK left CW alone without calling for help. The circuit court did not attempt to compel Baker to admit his guilt, nor did it punish Baker for maintaining his innocence. Because the sentencing court, under HRS § 706-606(2)(d), must consider the need for the sentence to provide the defendant with effective correctional treatment, the circuit court did not abuse its discretion in considering Baker's "lack of remorse in assessing the likelihood of successful rehabilitation." Id.

We conclude that the circuit court also gave adequate consideration to the remaining factors under HRS § 706-606. The circuit court addressed the seriousness of CW's injuries and the viciousness of the assault, demonstrating that the court examined

22

the nature and circumstances of the offense under HRS § 706-606(1), and the need for the sentence to reflect the seriousness of the offense under HRS § 706-606(2)(a). The circuit court also stated the need for Baker's sentence "to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant," demonstrating the court's consideration of HRS § 706-606(2)(b)-(c). In light of all of this, in considering the kinds of sentences available pursuant to HRS § 706-606(3), the circuit court expressed that it did not think that a twenty-year term of imprisonment, in other words, having Baker's two sentences run concurrently, would be sufficient.

Accordingly, Baker has failed to establish that the circuit court's imposition of consecutive sentencing was "arbitrary or capricious," showed a "rigid refusal to consider the defendant's contentions," or "clearly exceeded the bounds of reason . . . ." See Mundon, 121 Hawai'i at 349, 219 P.3d at 1136 (quoting Kahapea, 111 Hawai'i at 278, 141 P.3d at 451).

**ii. Cruel and unusual punishment**

Baker also contends that the circuit court's imposition of two consecutive sentences constitutes "cruel and unusual punishment." Baker argues that he should not serve the maximum sentence of imprisonment because his actions on the night of the assault were due in large part to drugs and alcohol consumption. Baker also noted that his natural parents were drug addicts, he was homeless for most of his life, he had no prior criminal record, and he was working to support his family.

> The standard by which punishment is to be judged under the 'cruel and unusual' punishment provisions of both the United States and Hawai'i Constitutions is whether, in the light of developing concepts of decency and fairness, the prescribed punishment is so disproportionate to the conduct proscribed and is of such duration as to shock the conscience of reasonable persons or to outrage the moral sense of the community.

Kahapea, 111 Hawai'i at 282, 141 P.3d at 455 (citations and brackets omitted).

As noted by the circuit court at sentencing, this

23

sexual assault was particularly vicious. CW testified that during the assault, Baker "was dragging [her] all over" and CW "was bleeding from head to toe." After the assault, Baker and GK caught the bus home and left CW to fend for herself. The assault left CW with a broken jaw, multiple lacerations, and several abrasions on her body, including her genitalia and anus. Both of CW's eyelids were so heavily lacerated that "a piece of her eyelid was actually hanging down, hanging from her eyelid over her eye," and her upper lip had a wound so deep that her upper teeth were visible through the wound. Tatiana Tovar, a crisis worker for SATC, testified that she remembered this case very well "because it was probably the most difficult case [she] ever did at SATC."

Accordingly, we conclude that Baker's forty-year sentence is not so disproportionate to his crimes nor of such duration as to shock the conscience of reasonable persons or to outrage the moral sense of the community, in light of developing concepts of decency and fairness.

### iii. Apprendi violation

In his final point of error, Baker contends that the circuit court's imposition of consecutive sentencing by a judge violated Baker's rights under the Sixth Amendment and Due Process clause because "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).

However, Apprendi and its progeny do not prohibit a sentencing court judge from making factual findings necessary to impose consecutive sentences. See Kahapea, 111 Hawai'i at 278-80, 141 P.3d at 451-53 (dismissing the proposition that Apprendi or Blakely v. Washington, 542 U.S. 296 (2004), proscribes consecutive term sentencing by a trial judge); Oregon v. Ice, 555 U.S. 160 (2009) (confirming the constitutionality of the practice of allowing sentencing courts to determine the facts necessary to impose consecutive sentences); see also State v.

Hussein, 122 Hawai'i 495, 229 P.3d 313 (2010) (upholding the trial judge's imposition of consecutive sentences). In Kahapea, the Hawai'i Supreme Court explained:

> Admittedly, stacking Kahapea's multiple sentences together has the effect of enhancing the length of his incarceration beyond ten years, the statutory maximum for one first-degree theft, see HRS § 706-660, supra note 8. Nevertheless, none of Kahapea's five individual terms of imprisonment exceeded the statutory maximum. . . . [T]he logic of the Apprendi rule [does] not apply to consecutive term sentencing . . . .

Kahapea, 111 Hawai'i at 279, 141 P.3d at 452.

Similarly, Baker's two twenty-year sentences, stacked together, enhanced his term of imprisonment beyond twenty years, the statutory maximum for one count of sexual assault in the first degree. See HRS §§ 707-730 and 706-659 (2014). However, neither of Baker's two individual terms of imprisonment exceeded the statutory maximum. Therefore, Baker's sentence of consecutive terms of imprisonment by a judge did not deprive him of his constitutional right to a trial by jury.

Baker seems to concede that the ruling in Kahapea allows a sentencing judge to impose consecutive terms of imprisonment without having the jury find any aggravating facts beyond a reasonable doubt. However, Baker argues that State v. Auld, 136 Hawai'i 244, 361 P.3d 471 (2015), which was decided after Kahapea, shows that "[t]here is a slowly evolving recognition of the definition of 'elements' under Apprendi," therefore, the State should have to prove to a jury beyond a reasonable doubt the aggravating circumstances that qualify Baker for consecutive sentencing. We disagree.

In Auld, the supreme court examined the Apprendi "fact of prior conviction" exception, which "excepts the 'fact of prior conviction' from the requirement that a jury find, beyond a reasonable doubt, those facts increasing the penalty for a crime." Auld, 136 Hawai'i at 252, 361 P.3d at 479 (quoting Apprendi, 530 U.S. at 489). This exception is based "on the fact that prior convictions have themselves been subject to the sixth amendment right to a jury trial and the accompanying requirement of proof beyond a reasonable doubt." State v. Maugaotega, 115

25

Hawai'i 432, 446 n.15, 168 P.3d 562, 576 n.15 (2007) (citations omitted).

Specifically, the Auld court scrutinized the Apprendi "fact of prior conviction" exception and its application to sentencing for repeat offenders under HRS § 706-606.5. The court held that repeat offender sentencing under HRS § 706-606.5 must be found by a jury beyond a reasonable doubt because it involves more than a mere finding of fact of a prior conviction:

> First, it must be proven that a prior conviction belongs to the defendant. Second, the prior conviction must be enumerated under HRS § 706-606.5(1) or (4). Third, the prior conviction must have occurred within the time frame set forth under HRS §§ 706-606.5(2), (3), or (4). Lastly, Hawai'i case law requires proof that a defendant subject to mandatory minimum sentencing as a repeat offender was represented by counsel, or had waived such representation, at the time of the prior conviction.

Auld, 136 Hawai'i at 254, 361 P.3d at 481.

We conclude that Auld is not inconsistent with Kahapea or Apprendi. Auld clarifies that Apprendi's "fact of prior conviction" exception does not apply to repeat offender sentencing under HRS § 706-606.5 because factual findings beyond the mere presence of a prior conviction are required in order to impose repeat offender sentencing under that specific statute. Because such factual findings would enhance a defendant's sentence beyond the ordinary penalty prescribed for the offense, they must be found by a jury. Kahapea, which established that facts increasing a defendant's term of imprisonment solely by means of consecutive sentencing may be found by a judge, is distinguishable from Auld inasmuch as consecutive sentencing, unlike repeat offender sentencing under HRS § 706-606.5, does not enhance a defendant's sentence beyond the ordinary penalty prescribed for each count. Therefore, Auld is inapplicable here, and we rest upon Kahapea in concluding that Baker's consecutive sentence was properly imposed upon facts found by the circuit court judge.

## IV. CONCLUSION

Based on the foregoing, the "Judgment of Conviction and Sentence" entered on January 29, 2016 in the Circuit Court of the First Circuit is affirmed.

On the briefs:

Dwight C.H. Lum,
for Defendant-Appellant.

Sonja P. McCullen,
Deputy Prosecuting Attorney,
for Plaintiff-Appellee.